ALLIED CHEMICAL & DYE CORPORATION, a corporation of the State of New York, and BY-PRODUCTS COKE CORPORATION, a corporation of the State of New York (Intervenor),

*vs.*

THE STEEL AND TUBE COMPANY OF AMERICA, a corporation created by and existing under the laws of the State of Delaware, CLAYTON MARK, HERBERT H. SPRINGFORD, ARMIN A. SCHLESINGER, HARRISON WILLIAMS, W. M. L. FISKE, EDWARD G. WILMER, LEONARD KENNEDY, ANSON MARK, CHARLES F. FAWSETT, GEORGE P. MILLER, FRANK F. CORBY, ADDISON H. BEALE, D. R. McLENNAN, HARRY COULBY, CHARLES T. BOYNTON, CLINTON S. LUTKINS, E. D. WINKWORTH and C. D. CALDWELL, Directors of the said The Steel and Tube Company of America; CLARENCE DILLON, ROLAND L. TAYLOR, JOSEPH H. SEAMAN, JOHN W. HORNER, JR., JAMES DEAN, R. W. MARTIN, WILLIAM A. PHILLIPS, W. M. L. FISKE, WILLIAM A. READ, JR., E. J. BERMINGHAM and J. V. FORRESTAL, co-partners doing business under the firm name and style of Dillon, Read & Company; CLARENCE DILLON, ARMIN A. SCHLESINGER, HERBERT H. SPRINGFORD and EDWARD G. WILMER, as Trustees, and THE YOUNGSTOWN SHEET & TUBE COMPANY, a corporation created by and existing under the laws of the State of Ohio.

*New Castle, June 25, 1923.*

Motion to dissolve preliminary injunction will not be passed on, unless facts adduced by evidence taken on such motion are sufficiently full to warrant reaching of a conclusion.

Under *General Corporation Law*, § 64a, where stockholders have authorzed sale of corporate assets and approved terms and conditions, the only question in suit for injunction is whether such terms and conditions are expedient and for best interests of the corporation, and question whether any sale should be made cannot be reviewed.

In determining whether proposed selling price of corporate assets over objections of minority stockholders is in best interests of the corporation, their intrinsic worth to the corporation as a going concern is not the sole question, as fair price can only be determined by considering also the buyer's side of the question.

Fair price is the resultant of the two opposing views of a willing seller and a willing purchaser, the former of whom is not compelled to sell and the latter of whom is not required to buy.

In determining whether proposed selling price of assets of steel company, embracing coal and iron mines, blast furnaces, coke ovens and finishing mills, over objection of minority stockholders, is fair, the fact that possible purchasers are exceedingly few in number must be taken into consideration.

In determining whether proposed selling price of corporate assets over objection of minority stockholders is fair, the test is whether it is to injury and damage of the objecting minority stockholders, regardless of profit to the stockholders controlling the corporation, as they stand in fiduciary relation towards the minority stockholders.

In determining whether proposed selling price of corporate assets over objections of minority stockholders is expedient and to best interests of the corporation, under *General Corporation Law,*, § 64a, the only question is whether price is fair, though gist of complaint is alleged breach of fiduciary duty by those in control of the corporation.

In determining whether proposed selling price of corporate assets is fair to objecting minority stockholders, judgment of directors will not be accorded benefit of presumption of fairness ordinarily accorded official acts, when they have peculiar and special interest in the sale.

Discrepancy between what Chancellor conceives to be fair price for corporate assets and proposed selling price must be so great as to be attributable to bad faith, before sale will be enjoined at instance of minority stockholders.

In determining selling value of corporate assets, which directors, with approval of majority stockholders, have contracted to sell over objections of minority stockholders, earning power controls replacement cost.

In suit by minority stockholders to enjoin sale of assets of steel company, embracing coal and iron mines, blast furnaces, coke ovens and finishing mills, evidence *held* to show that proposed selling price represented fair value of such assets and was adequate.

Opinions of witnesses as to true selling value of steel company's property, embracing mines, blast furnaces, coke ovens and finishing mills, will be given no weight, except as all facts, with all their reasonable intendments, are calculated to sustain them.

Property of corporation will not be appraised for purpose of determining whether proposed selling price is fair on basis of value after certain improvements have been made, where such improvements would require additional capital, which cannot be had, except from the common stockholders, and they are unwilling to furnish it.

Where earning power of corporation from viewpoint of common stockholder has been exceedingly poor, and it is the common stockholders who are objecting that proposed selling price of plant and assets is insufficient, and bondholders and preferred stockholders will be paid in full, fairness of the price must be passed on in light of interests of common stockholders.

Fairness of proposed selling price of corporate assets over objection of minority stockholders must be judged in light of conditions as they existed when contract of sale was made, disregarding subsequent increased earnings.

MOTION TO DISSOLVE PRELIMINARY INJUNCTION. After the issuance of a preliminary injunction pursuant to the opinion heretofore filed in this cause, *ante p.* 1, the defendant, The Steel and Tube Company of America, moved its dissolution. An examiner was appointed to take testimony on the question of the fairness of the price at which the assets of The Steel and Tube Company of America were contracted to be sold, and the motion to dissolve came on to be heard on the testimony of witnesses and exhibits. The facts pertinent to the decision of this motion are set forth in the opinion of the Chancellor.

*William S. Hilles*, and with him, *Nathan L. Miller* and *Frederic Cunningham, Jr.*, both of New York City, and *K. K. Knapp*, of Chicago, Illinois, for the complainants.

*Robert H. Richards*, and with him, *George W. Wickersham, W. Lloyd Kitchel, Joseph P. Cotton*, and *Boykin Wright*, all of New York City, and *Charles F. Fawsett*, of Milwaukee, Wisconsin, for the defendant The Steel and Tube Company of America.

THE CHANCELLOR. This cause was before me on another occasion upon a rule to show cause why a preliminary injunction should not issue. See *ante p.* 1. No further statement of facts of a general nature need be made beyond what may be found by reference to the opinion filed by me in disposing of the rule for premininary injunction.

The preliminary injunction was duly issued for the reason stated in the opinion heretofore filed. Reference to that opinion will disclose that I was not satisfied upon the showing then made to pass upon the question of the fairness of the price at which it was proposed to sell the assets of The Steel and Tube Company

of America, and deemed it wise to hold the proposed sale in abeyance pending full hearing upon that question.

Within a short time after the issuance of the preliminary injunction, the appearing defendant moved its dissolution. Thereupon, after hearing the parties, I directed the appointment of Caleb S. Layton, Esq., as examiner and commissioner to take testimony of witnesses produced on behalf of both parties, upon the question of the fair value and adequacy of price of all the assets proposed to be sold by The Steel and Tube Company to The Youngstown Sheet & Tube Company.

The pending motion to dissolve the injunction is, therefore, to be disposed of in the light of the evidence which the fuller hearing before the examiner and commissioner has produced. This evidence consists of a large volume of testimony and numerous exhibits. It is of such fullnes and of such character as to indicate that I am now in possession of about all the facts that the parties can adduce in support of their respective views. At all events, I am convinced that further evidence on a final hearing would produce nothing more, if anything, than a mere amplification of details. In view of the determining effect of the mere passage of time upon the practical disposition of the litigation, it would appear to be the duty of the court to proceed to pass upon the question of the continuance of the outstanding injunction at the earliest practicable moment. This should not of course be done in view of the opinion heretofore filed, unless the facts now adduced by the evidence taken are sufficiently full to warrant the reaching of a conclusion which under the facts as they appeared upon the return of the rule I stated I was unable to do with any satisfying degree of confidence in my judgment. I now feel that I can reach a satisfying conclusion upon the facts before me, and I accordingly proceed to do so.

The question before me is one that concerns value. It is not one of cost value or of replacement value. It is a question of value in connection with sale. I have already held that *Section* 64*a* of our *General Corporation Law* (29 *Del. Laws, c.* 113) permits The Steel and Tube Company of America to determine the question of whether it shall sell all its assets entirely aside from any consideration of advisability or expediency. The only room for considera-

tion of such questions as expediency and advisability which the statute affords is in connection with the terms and conditions of sale. The directors are the ones under the section who pass upon these terms and conditions. In the instant case, as a matter of fact, the stockholders by their approving action also passed upon them. Whether the section requires them to do so, I need not pause to consider. The fact is that they did. The stockholders did two things. They authorized a sale and they approved of the judgment of the directors as to its terms and conditions. This means that if the sale was consummated upon the terms and conditions mentioned, they desired to authorize it. The only element in the corporate action thus proposed to be taken that can be called in question is whether the terms and conditions were such as to meet the test of being expedient and for the best interests of the corporation. The other element in the corporate action, to-wit, the fact that a sale should be made cannot be reviewed by the court.

This being so, the question of the expediency of the terms and whether they are in accordance with the best interests of the corporation must, when it is sought to review them as here, be passed upon in the light of the fact that it is desired to exercise the absolute right to make a sale. In other words, the question of terms is a question of selling terms. A sale can never, of course, be a one-sided affair. It necessarily imports a seller and a buyer. If the question is asked, "What selling price is expedient for a seller and in his best interest?" it is not satifactorily answered by stating in terms of dollars what the value is to the seller for his own use, because before the thing can be sold some one must be found who is willing to become a purchaser. Hence in ascertaining the fair price at which to sell a given thing, the willingness of the buyer to pay, as well as the willingness of the seller to receive, is an important and influencing factor. When, therefore, the section in question which authorizes a sale is to be construed, the test that the terms and conditions must be expedient and in the best intersts of the corporation is to be applied in the light of the fact that the corporation in making the sale must find a purchaser. In other words, the best interests of the corporation are those of a corporation desiring to sell. When this is said, the opposing in-

terests of a purchaser are introduced into the situation as a factor. If these views are correct, then the ingeniously argued contention of the learned solicitors for the complainants that the "value to be considered in this case ought to be measured by what the assets were intrinsically worth to the company for use by the company considered as a going concern" cannot be accepted as presenting the sole fundamental point of view from which to approach the question of the fairness of the price here involved, because such a point of view fails entirely to consider that on the other side of the negotiation for price there is a purchaser whose views may be and in most like instances are quite divergent from those of the seller. The fair price at which the assets should be sold is to be determined by considering the matter not only from the side of the seller in the light of what is contended for by the complainants as the sole consideration, but also from the side of possible purchasers in the light of what the assets may be worth to them. There are, of course, many factors that enter into what may be a fair price in a given case for a seller to take and for a purchaser to pay. But fundamentally the fair price is the resultant of the two opposing views of a willing seller and a willing purchaser, the former of whom is not compelled to sell and the latter of whom is not required to buy. There may be particular circumstances in which the owner finds himself which may make a price fair and reasonable which under other circumstances might be unfair and unreasonable. The extreme illustration of such a case would be that of one who is forced to sell. In proportion as the situation of the seller is removed from that of constraint impelling the sale, the price which in fairness to himself he ought to take will advance above that which the necessities of desperation would suggest. In the instant case, there is no situation which suggests a forced sale. But there are circumstances, as I shall attempt to point out, which it seems to me make it advisable for the seller not to stand resolutely for a price which, if it were differently circumstanced, it might in fairness exact. Furthermore, the seller ought to be governed in the matter of price which he would be willing in fairness to himself to receive by not only the thought of what the property has cost, or what it can be duplicated for, but as well by the breadth of the market in which possible purchasers are to be

found.   This is manifestly so because the fewer the possible pur-
chasers the less opportunity is there for the seller to reap the ad-
vantage of rivalry in offerings.   It is plain that the owner of a
barrel of flour stands an infinitely better chance to secure a price
therefor close to the cost of replacement than would the owner of
a tremendous aggregation of industrial units composing a self-
contained steel enterprise, embracing coal and iron mines, blast
furnaces, coke ovens and finishing mills.   And so in considering
the fairness of the price for which it is proposed to sell the assets
of such an enterprise as this, it is proper to take into account the
fact that the possible purchasers are exceedingly few in number.
This circumstance might very properly suggest the unwisdom of
making a sale at all.   At the same time if a sale is desired to be
made, the circumstance just mentioned may fairly be taken into
account in passing upon the adequacy of the price proposed.

On the side of the purchaser, the sole consideration to which
it seems to me attention would be given is, "What is this property
worth to me?"  In answering that question I suppose the primary
thought upon which the answer would turn would be, "What can
the property be made to earn?"  This in turn would depend upon
what any person competent to turn the property to profit-making
uses could make it yield on the investment, or the price paid; and
next, in addition, upon its desirability as a prospective profit-
maker due to the particular needs of the individual purchaser. In
the instant case, it appears that the properties of The Steel and
Tube Company of America are, for particular reasons which I
shall not pause to enumerate, desirable for The Youngstown Sheet
& Tube Company, the proposed purchaser. ·If this be so, then The
Youngstown Sheet & Tube Company would be more willing to take
the property than would one having no special motive beyond
that of wanting for the first time to get into the steel business,
and as a consequence would doubtless be willing to pay a better
price than would otherwise be the case.  If this be so, then the dis-
advantage of having a lean market in which to make the sale is
to an extent offset in favor of the seller.

The foregoing are general considerations which may be re-
garded as having been in the minds of the seller and purchaser in
the bargaining for the price named in the contract here concerned.

From the conflict of these two opposing forces of judgment, if no *mala fides* intervenes, the price named in the contract ought to appear to be the fair resultant.

Before answering the question of whether the price is fair to the seller, it is appropriate for me to observe, because of the course of argument advanced on one of the briefs filed by the complainants, that I accept the view that the test of the fairness of price, the sale being regarded as made by those who stand in a fiduciary relation towards the complainants (see *ante p.* 1), is whether it is to their injury and damage, regardless of whether it is also to the profit of the alleged fiduciaries. The opinion heretofore filed is in harmony with this conception.

The only terms and conditions of the proposed sale which are assailed in this cause as not being "expedient and for the best interests of the corporation" are those which specify the price to be paid. All that I am called upon to consider, therefore, is solely the question of price. If the selling price is a fair one under all the facts, then the requirement of the statute that terms and conditions shall be expedient and for the best interests of the corporation has been met. I can conceive of nothing outside of fairness appropriate to be taken into account when the inquiry is narrowed to whether a given price is such as is expedient and for the best interests of the corporation. It may be taken as true, as contended for by the complainants, that the gist of this complaint is an alleged breach of duty by those in control of the corporation towards the minority, towards whom they owe duties of a fiduciary nature. But the extent of that duty, as heretofore held, is to secure for the corporation a fair and adequate price upon the sale. So that we come back to the question of fairness of price, for if the price is fair then the full duty of the fiduciary has been done, and no ground of complaint exists.

What is a fair price for the majority in control of the corporation to accept for the assets, is a question of opinion. What is a fair price for which to sell property is always a matter of opinion. Opinions vary. In proportion to the distance the property in question is removed from the qualities of simplicity and common familiarity, the difficulty of ascertaining the question of its fair selling value is increased. In the intant case, the property con-

stitutes the assets of a large self-contained steel manufacturing industry, with its plants, mines, furnaces and ovens scattered over territory located in some five or seven states, and admittedly worth at least $73,000,000. If opinions differ concerning the value of property in its simpler and more familiar forms, here it ought to be freely conceded that a wide divergence in opinion is to be naturally expected concerning the fairness of price.

Laying aside for the moment the views of the majority who constitute the syndicate, and who have an interest peculiar to themselves, it yet appears that among the minority interests no unanimity of opinion exists as to the fairness of the particular price named in the contract. The complainants who own about twenty per cent. of the common stock think the price is grossly inadequate. But other minority interests, who are as free from participation in the syndicate motives as are the complainants, and whose holdings of common stock are slightly above twenty per cent., are on the other hand of the opinion that the price named is a fair one. I find nothing in the case which leads me to think that the minority which approves the price is not as equally honest as is the complaining minority in the forming of its opinion. The case within itself, therefore, supplies an illustration of the truth of the observation just made, that wide divergence of opinion in such matters as this is to be naturally expected.

I am not to take the opinion of any one group among the stockholders of this corporation. Nor can I give to the judgment of the directors the benefit of that presumption which the law would ordinarily accord in favor of the fairness of their official acts. This is because of the peculiar and special interest attributable to them which in the opinion heretofore filed was pointed out and described. I conceive it my duty to pass upon the question presented in the light of the evidence now before me, according to neither of the groups of stockholders the controlling advantage of its mere opinion. In doing this, however, I shall bear in mind that in such a matter as this no man's judgment can be expected to be correct to a positiveness, and that my own is as apt to err as is that of any one else. This requires that I avoid, as far as I can, the attitude of mind that results in *ex cathedra* utterances.

Furthermore, even if it should be that my own view should

be that the price named is not full or adquate, yet the discrepancy between what I should conceive to be the fair one and the price named in the contract would have to be so great as to lead me to think that it is to be atributed not to a difference of opinion upon a highly debatable question, but rather to bad faith, before I would feel justified in continuing the injunction.

I now approach the question of the fairness of price, whether the price named is an expedient one and for the best interests of the corporation. The complainants, in their brief in speaking of the standard of value which should be applied, use the following language:

"   *   *   *   There are two measures of value of such a property that may be established by facts: (a) Replacement cost new, less depreciation and obsolescence for imperfect design and arrangement;  (b) earning power. The latter will control the former, for if less than a fair return on cost, the value will be less than cost, and if more than a fair return, something more will be added for goodwill, or going value."

While the foregoing statement may be subject to some criticism, yet in a general way it describes the elements that are to be taken into account as proper to be considered in passing upon the value of the property involed.  At least the evidence adduced on both sides has been of such character as to indicate that these two elements are the chief if not the only ones considered by the parties as lying at the bottom of the question. Of the two, the second one, that is the one that concerns earning power, is by far the more important, because no one will buy property for industrial purposes at a price in excess of a reasonable capitalization of its earning power.   The learned solicitors for the complainants are, therefore, correct in their statement that in considering value in a sale, earning power will control replacement cost.

Insofar as replacement cost is concerned, there is little or no dispute. Both complainants and the defendant accept, as the starting point for their respective contentions with respect to this, certain values placed upon the properties of The Steel and Tube Company of America as the result of an appraisement made in the latter part of the year 1921.   This appraisal gave a sound value to all the properties carried in the company's property account of $63,822,546, exclusive of coal properties which were appraised at

74    ALLIED CHEM. & DYE CORP. vs. STEEL & TUBE CO.

Opinion.

$4,691,897.  The total gross assets of the company were, of course, in excess of this sum, aggregating as of December 31, 1922, the book value of $94,767,000.  The appraisal referred to, including coal properties, gave to all the asets a value of $95,737,000, being about $1,000,000 in excess of the book values as of December 31, 1921. (NOTE.—I shall not burden this opinion with a detailed discussion concerning apparent discrepancies in figures given by the witnesses when such discrepancies are not sufficiently material to warrant attention.)

The properties embraced in the appraisal report going to make up the above sum of $63,822,546, are the following:

| | |
|---|---:|
| Mark plant and townsite, Indiana Harbor | $27,127,056 |
| Iroquois plant | 8,863,158 |
| Zanesville plant | 3,636,984 |
| Evanston plant | 2,063,771 |
| Mayville plant | 4,819,000 |
| Kalamazoo plant | 823,120 |
| Iron mines | 13,815,998 |
| Zinc properties | 2,673,459 |
| | $63,822,546 |

The contract of sale proposes to sell the above properties and all the other assets of the company for a price equal in round numbers to $73,000,000.  The witness Wilmer testifies that this price is equivalent to the payment by the purchaser of seventy to seventy-five cents on the dollar for the entire depreciated fixed property and investment account, and paying one hundred cents on the dollar for all other assets comprising largely current assets and deferred charges.  I am unable to understand how he makes his calculation so as to bring this result.  Taking the property and investment accounts as they appear to be in the statement of Mr. Reynder's final appraisal figures, the property account and investments are together $71,539,000, and other assets are $24,198,000. On this showing, if the latter is paid for by the purchaser at one hundred per cent., the property account and investments will receive sixty-six plus per cent.  This statement will, however, suffice to indicate to what extent the proposed sale discounts the face value of the property account of $69,644,000, and the investments

account of $1,895,000, together $71,539,000. (What these "investments" are I do not know. So far as I recall the record fails to disclose their nature.)

The complainants insist that all of the discount of appraisal values which the proposed sale contemplates is to be charged to the property account alone, because it is to be assumed that the "investments" and other assets, consisting chiefly of current assets of $27,611,174, will readily liquidate at full value. Hence, the contention is that the property account alone must be regarded as the sole bearer of the write-off from appraised values which the sales price necessitates. Mr. Wilmer, on the other hand, testifies that when the entire assets are being sold for a price below their appraised value, it is not permissible to allocate to one particular group of assets the entire discount, because it is by no means certain that current assets are worth their face value on a sale. I am inclined to take this view as a general proposition. I do not know that the point is worth discussing, however, for the evidence on both sides has been adduced upon the assumption that the shrinkage in appraised values to the $73,000,000 named as the purchase price, insofar as it is to be accounted for by overvaluation, is to be attributed to the property account. No evidence has been adduced tending to show overappraisal of current assets and "investments."

Aside from general conditions described by the defendant's witnesses as peculiar to the situation of the business of The Steel and Tube Company of America, the testimony as to value deals entirely with the above properties listed in the property account as appraised at the total figure of $63,822,546. As already noted, the coal properties are omitted from the list. These coal properties were appraised at $4,691,897 by Messrs. Allen and Garcia. The testimony of defendant's witness Eavenson to the effect that their true selling value was not in excess of $2,540,170 was so convincing that it was accepted by the complainants and proper reconciliation made for their overappraisement.

This still left, however, the other eight properties (listed above) subject to the dispute as to whether they were overappraised. Let us see now to what extent these eight properties are to be written down if the other assets are to be paid for by the

purchaser at the rate of one hundred cents on the dollar. These other assets amount, as stated, to $24,198,000. Deducting this sum from the purchase price of $73,000,000, leaves $48,802,000 applicable to property account and investments. Property account and investments amounting to $71,539,000, and only $48,802,000 of the purchase price remaining after other assets are paid in full, means that there is a deficiency below the appraised value of property account and investments of $22,737,000, which is to be borne by a write-down of the appraised values of the above eight properties. That is to say, in order for the price of $73,000,000 to cover the full value of all assets, then the above eight properties instead of being worth the appraised value of $63,822,546, are worth thirty-five plus per cent. less, or $41,085,540.

The complainants make a showing that the sums which the sale proposes to deduct from the appraised values instead of being, as I have indicated, $22,737,000, is about $23,500,000. The difference is not sufficiently large to warrant me in pausing to try to reconcile the two figures. Let us call it the round figure of $23,000,000. This sum, then may be stated to be the amount by which the above eight properties are written down by the proposed sales price. Is such a write-down justified?

In answering this question, the parties have adduced evidence bearing upon the values of the respective eight properties listed above, the complainants endeavoring by their testimony to sustain the full appraised value and the defendant by its testimony attempting to show that they are not worth the figure appraised by at least as much as the above sum of $22,737,000. The testimony thus produced deals not only with the general features of the property assets of the corporation, but as well with the peculiar conditions of each individual unit. As I have above stated, the true value upon a sale to be attributed to the properties of the company is a matter of opinion. Opinions, however, to be worth while, must be sustained by some showing of facts and reasonable implications therefrom. Witnesses on both sides have expressed such opinions, but I decline to give these opinions any weight, except as the facts with all their reasonable intendments are calculated to sustain them.

With respect to one of the eight properties listed above, I

have been able to reach a degree of certainty regarding its value more positive in character than I have been able to do with respect to the other seven. I refer to the "iron mines" appraised at $13,-815,998. The method by which the iron mines were appraised was, in a general way, for the appraiser (Dr. Charles Kenneth Leith, geologist, of the University of Wisconsin) to estimate the quantity of ore in the mines, calculate the probable life of the mines from the annual production records, ascertain the annual profit and capitalize the annual profit on the proved ores at eight per cent. and the prospective ores at fifteen per cent. This formula enabled him to arrive at the present appraised value of $13,815,998. It would not be worth while for me to discuss in detail the uncertain, and to a very large extent speculative, features that inhere in this method of ascertaining value. It seems to be the most modern and best proved method for attempting to arrive at the value of such unseen and, therefore, problematical assets as ore in the ground. A large amount of testimony was taken upon the reliability of this method of calculation as a fair indication of true selling value. It seems to me to be apparent that after making due allowance for what degree of accuracy in calculation there may in employing such a formula as here used, the result must, nevertheless, remain highly speculative. It appears that iron ore properties are very rarely, if ever, sold for a flat sum of money. The usual method of selling them is upon a lease and royalty basis. This argues that those who are desirous of acquiring iron ore properties recognize the unwisdom of accepting appraised value arrived at in such fashion as this as a certain indication of the market worth.

The testimony supplies to me a reasonably certain index to the reliability of values for ore properties arrived at in the foregoing manner as an indication of market value. I am guided to my conclusion with respect to the iron mines very largely by this index. I refer to the fact that the coal mines were, in a general way, appraised in the same manner as were the iron mines. It so happens that there has been some market for coal mines. Whether this is because the conditions of a coal mine are such as to render more certain in probability accuracy in their valuation I do not know. From the fact that there have been sales of coal mines at flat sums, I would conclude such to be the case. The coal mines

were appraised by Allen and Garcia at $4,641,897. A witness, Mr. Eavenson, was produced who was able to show by market transactions in which coal mines were sold for flat sums that the appraised figure of these coal mines was too great by about fifty per cent. This testimony serves to compare the values of coal mines arrived at by the method of appraisal in question with the value of like mines ascertained from actual sales. The testimony was so convincing that the complainants accepted it as reliable. If a comparative study of the sales of coal mines indicates that the market value of the coal mines of The Steel and Tube Company of America is only fifty per cent. of the value which the appraisal method referred to would give to them, it seems to me to be more strongly apparent that iron ore properties should have their appraisal value (arrived at in the same way) discounted by at least a like amount in order to ascertain their reasonable market value. For this reason I feel it is safe to say that the iron mines appraised at $13,815,998 should be given a market value of only one-half that sum, or $6,907,999.

This sum, therefore, is to be deducted from the above round figure of $23,000,000, which will leave $16,092,001, the balance of the write-off figure to be borne by the other seven properties above listed.

Before taking up these other properties it is pertinent to describe the nature of the appraisal that was made of them. This appraisal was made in the latter part of the year 1921. The appraisers were Dr. Leith for the iron ore properties, Messrs. Allen and Garcia for the coal properties and Mr. Brassert and Mr. George for the ovens, furnaces and plants. The purpose of the appraisal was to supply data for use in connection with negotiations that were afoot looking towards a merger of The Steel and Tube Company of America, The Youngstown Sheet & Tube Company and the Inland Steel Company. The appraisers in doing their work sought only to ascertain the replacement cost of the various properties as of the date of the appraisal. The appraised figure for each property was fixed at the sum which it would cost to construct the property as constituted at that time, less proper allowance for age and obsolescence, and the values so arrived at were called "sound values." Nothing was taken into

account beyond these features. For instance, the Mayville property, located at Mayville, Wisconsin, was appraised at just as high a figure as it would have been had it been located in the more desirable Chicago district. This being the nature of the appraisement, Mr. Brassert, as well as other witnesses for the defendant, states that the appraisals were by no means intended to indicate commercial values. The companies concerned sought to have as high values placed upon their respective properties as the appraisers could be induced to put upon them. It can readily be seen why there was a desire on the part of each to have such high value given to the properties. Furthermore, the testimony is that Mr. Brassert, when he was invited to undertake the task of making the appraisement, stated to those who employed him that the figures which would result by such a method of appraisement would be exceedingly high and he insisted that if he undertook the work the figures arrived at should not be used as indicating commercial values.

Thus at the outset it is to be stated that the figures placed opposite each of the above properties as representing sound value are not intended to indicate commercial values. It is interesting to note in this connection the testimony of Mr. McKee, the consulting and contracting engineer, called by the complainants as their chief expert witness. It appears that Mr. McKee had made an appraisal of assets for Rogers-Brown Iron Company. This appraisal was made by him very much on the same basis as was the appraisal of the Steel and Tube Company's assets, made by Mr. Brassert in behalf of the three companies which contemplated a merger. Both appraisals gave sound, or replacement, values. While Mr. McKee testifies that the sound values given by Mr. Brassert to the properties of The Steel and Tube Company of America fairly represent commercial values as he defined the term, yet with respect to the sound values which in a similar appraisal he gave to the Rogers-Brown Iron Company's assets, he testifies they would be at least twenty-five per cent. more than the commercial values. This emphasizes the fact that sound values are no fair indication of market or commercial value, and the fact that such values are quoted to the investing public when securities of the owning company are to be sold does not alter the situation.

I think it may be safely assumed that industrial enterprises are not generally given to depreciate values of their own assets as carried on their own books. If the book values placed upon these properties by the owner thereof may be said to have been liberally placed (and this is indicated by a write-up which from time to time The Steel and Tube Company of America gave to its own properties amounting, as I recall, to something between $12,000,000 and $15,000,000), then the appraisal figures must be regarded as exceedingly generous, because they give to the eight properties above indicated a total value of $1,000,000 above what the books of the company had indicated.

The testimony of Mr. Brassert is the principal testimony relied upon by the defendant to sustain its contention that the write-down from the appraised values of the above properties is justified. Mr. Brassert would knock off from the values of the Indiana Harbor plant, the Iroquois plant, the Zanesville plant and the Evanston plant from twenty-five to thirty-five per cent. This he justifies upon two grounds: First, that the replacement cost is on the basis of 1921 prices; that these prices are at least one hundred and fifty per cent. above the pre-war prices; that the plants of the companies with which The Steel and Tube Company of America must compete have been acquired by competitors in the main upon the cheaper pre-war basis (only twenty per cent., for instance, of the Republic Steel Company's construction is attributable to the high cost basis); that any purchaser of plants of The Steel and Tube Company of America could not afford to pay a price therefor which would place him, in the point of cost of investment, at a competitive disadvantage with the others. Second, because the units of The Steel & Tube Company of America are not well integrated. For instance, the Iroquis plant, in South Chicago, is about six miles distant from the Indiana Harbor plant. The Evanston plant, in North Chicago, is about twenty-five miles distant from the Indiana Harbor plant; the Mayville plant is in Michigan, one hundred and eighteen miles distant from Indiana Harbor; and the Zanesville plant is in Ohio, about three hundred and fifteen miles distant from Indiana Harbor. The Mayville plant manufactures market pig iron. It is so detached that there is no attempt to integrate it with the general

steel operations of the company. Indiana Harbor is an ingot, pig iron and coke producing plant and one of the large finishing plants. Its pig iron is supplied to it by its own blast furnaces and also by the Iroquois plant. In order for the Indiana Harbor plant to avail itself of the pig iron production at Iroquois an expensive interplant movement must take place. That is to say, coke is shipped from Indiana Harbor to Iroquois, where it is used in the manufacture of pig iron; the pig iron in turn is shipped back in a cooled state to Indiana Harbor, there to be turned into steel. When received at Indiana Harbor it needs to be reheated. There is thus considerable loss due to this lack of integration between these two very important units consisting of transportation expenses of coke in the one direction and pig iron in the other, and of the necessity of reheating the pig iron. Furthermore, the skelp necessities of the Zanesville plant must be supplied by a three hundred and fifteen mile shipment from Indiana Harbor to Zanesville. There is likewise a freight cost necessitated by the interplant movement from Indiana Harbor to Evanston. The point made of all this by Mr. Brassert in connection with his general write-down of from twenty-five to thirty-five per cent. of the appraised value of the properties is that if a purchaser desires to spend a large amount of money, so much as the appraised replacement values of all these properties, in order to venture upon the steel business, he would find it much more to his advantage to do so in a way that would give him a steel operating outfit thoroughly integrated by having all the manufacturing units brought together at the same site.

In view of the fact that strong competitors of The Steel and Tube Company of America are integrated in just such a manner as this, it is Mr. Brassert's view that any proposed purchaser of The Steel and Tube Company of America would, as a matter of necessary self-protection, discount the actual replacement cost of the plants to a considerable extent.

This line of reasoning appeals to me with a great deal of force. The chief thing that I discover in the testimony of the complainants by way of offset to this logic is the suggestion that Indiana Harbor is more favorably located than are its competitors; that its chief output is pipe; that the West supplies a very great and

active market for this commodity; that Indiana Harbor, being located as it is in the Chicago district, enjoys a freight differential upon shipments to the West amounting to something like $4.00 per ton against its competitiors located in the East, familiarly described as the Pittsburgh district. This suggestion is of particular weight with respect to Indiana Harbor. It has no application to Zanesville, which for freight purposes at least is in the same category as other steel producing concerns which are in the Pittsburgh district.

Whether the advantages that The Steel and Tube Company of America enjoys by reason of this freight differential are sufficiently large to offset the disadvantages under which it labors by reason of the economic waste occasioned by the interplant movements, it is, of course, difficult to say. This, however, seems to be apparent, that the advantage of the freight differential cannot be capitalized in the future as it can now. I say this for the reason that the United States Steel Corporation is now constructing a great plant at Gary, Indiana, which is a few miles from the Indiana Harbor plant of The Steel and Tube Company of America, and which by reason of its location will enjoy the same freight differential which the complainants have so strongly emphasized in connection with the property of The Steel and Tube Company of America. The proposed plant at Gary, when finished, will have and annual ingot capacity three times as great as that of The Steel and Tube Company of America. It is, therefore, apparent that within a very short time The Steel and Tube Company of America, with the burden of its interplant costs, will face a very serious competitor. The evidence discloses that the United States Steel Corporation's plant at Gary, now in course of construction, will be a thoroughly intergrated plant. A great and powerful competitor, therefore, is about to enter the immediate field with the advantage in its favor of being able to operate as economically as a thoroughly integrated plant will permit, and at the same time enjoy the same freight advantages on Western shipments as are now claimed for Indiana Harbor.

This consideration suggests to me that in considering the price to be received from the sale of the Steel and Tube Company's properties, the sellers would be justly entitled to take into

account the jeopardy which the very near future threatens to the business of their company.

In reply to the point that the United States Steel Corporation will prove a dangerous competitor in the near future with the advantages pointed out in its favor, the complainants contend that, while all this may be true, yet the United States Steel Corporation when it finishes its construction at Gary, will find itself in possession of a plant the investment in which will be on the basis of the present cost of construction. If this be so, it is argued that the United States Steel Corporation will enjoy no advantage against The Steel and Tube Company of America. With respect to this I have to say that it is not convincing, because the United States Steel Corporation has such a vast investment in properties at pre-war prices that, if necessary, it can very well afford to carry its new plant at a figure on its books considerably below the actual cost of construction. In other words, it can, with financial comfort, have its low cost properties aggregating a tremendous total absorb any additional cost at Gary due to present construction figures.

What I have thus far said presents the conflicting views of the parties with respect to the proposition made by the witness Brassert, that a general write-off of from twenty-five to thirty-five per cent. should be made on the appraised value of the Steel and Tube Company's properties in order to get them down to what would be a fair price that a willing purchaser would consent to pay.

I shall not attempt to name the precise percentage which should be written off because of the two reasons advanced by Mr. Brassert. In my judgment, however, there should be a substantial write-off. In his suggestions Mr. Brassert would not write off the same percentage for every plant. I believe he suggests that the Indiana Harbor plant ought to suffer a write-off of twenty-five per cent. and an additional $5,000,000 because of the necessity for the interplant movement existing between Indiana Harbor and Iroquois. The total of these suggested deductions from the Indiana Harbor plant makes $11,110,765. For the same reasons he would write off twenty-five per cent. from the value of the Iroquois plant (taking no account of the interplant movement—leaving all of that to be borne by the Indiana Harbor plant), making a write-off for

the Iroquois plant of $1,633,289. He would also write off against the Zanesville plant $909,246, and against the Evanston plant $515,943. For additional reasons peculiar to Mayville, he would write off altogether from the appraised value of that plant $3,019,000. The total of these write-offs suggested by the testimony of Mr. Brassert is $17,188,243. To this sum I add the figure which I have, for the reasons above indicated, accepted as proper to be deducted from the appraisal value of the ore mines, making a total deduction thus far (on the basis of Mr. Brassert's testimony) of the sum of $24,096,242. There are two properties listed in the eight properties above mentioned remaining for consideration. These are the zinc properties and the Kalamazoo plant. Concerning the former, there is no testimony of moment. Accordingly it may be taken at its full appraised value. Concerning the Kalamazoo plant, however, Mr. Brassert testifies it should suffer an eighty per cent. reduction. Inasmuch as the complainants on their brief express a willingness to accept this reduction, the Kalamazoo plant may be charged with a write-off of $658,496. Adding this sum to the $24,096,242 just mentioned, makes a grand total of deductions (on the basis of Mr. Brassert's testimony) of $24,754,738. This is well in excess of $23,000,000, which, as above indicated, the eight plants in question are expected to bear by the proposed selling price of $73,000,000.

If Mr. Brassert's testimony is to be accorded credit, then on the basis thus far considered, it is apparent that the sales price of $73,000,000 is a fair one. His write-off of $3,019,000 for the Mayville plant is strenuously contended not to be justified by witnesses for the complainants. The Mayville plant is a producer of market pig iron. It secures its ore from the Mayville iron ore mine. This ore seems to be of high phosphorous content. The plant has both coke ovens and blast furnaces. The coal for its coke ovens is secured by rail and water transportation from the company's mines in Kentucky and West Virginia. Mayville is located inland from Lake Michigan. The point at which it makes its water connection is Milwaukee. It is conceded that the coke ovens at Mayville are of very old type—as I recall, something like twenty years of age—though in recent years they have been rebuilt. The defendant contends that because of the high phosphorous content

of the ore available for the Mayville plant, it is necessary to draw ore from other fields to mix therewith in order to produce an iron that can fairly compete in the markets. I do not see that the matter of freight transportation on this outside ore is a factor of any moment in the situation. The defendant contends further that because of the old type of coke ovens at Mayville, and because of the fact that there is no market at Mayville for the gas produced from the manufacture of coke, the Mayville ovens cannot economically operate. In addition to this they further say that the Bessemer pig there produced is readily marketable only in times of prosperous business conditions. For these reasons the Mayville plant, according to the defendant's contention, is very far from desirable as a competitor in its particular field. As illustrating the inability of the coke ovens to hold their own in competition, the defendant points out that the Mayville plant has found it to its advantage, instead of coking its own coal, to buy coke from the Milwaukee Coke & Gas Company, some several miles distant. There are some innuendoes in the record to the effect that this refusal to make its own coke is due not to the inefficiency of its own ovens, but rather to some interlocking interests in The Steel and Tube Company of America and the Milwaukee Coke & Gas Company, by reason of which the Mayville plant is made to suffer in order to give business to the Milwaukee Coke & Gas Company. This, however, is mere innuendo. I find no evidence to sustain it as a fact.

I shall not attempt to review the evidence, of which there is much, dealing with this controversy concerning the Mayville plant. The testimony is undisputed that in the various merger negotiations which took place from time to time, The Steel and Tube Company of America was required strenuously to contend with the other parties to the proposed mergers, in order to save to itself something in values for the Mayville plant. This seems to me to be confirmatory evidence coming from practical steel and iron people of the conclusion which I have reached, to the effect that the Mayville plant must be very substantially written down from the appraised figure.

While I am firmly of the opinion that the eight properties above named should be very substantially written down below

the appraised values given in Mr. Brassert's report, I am not prepared to say that they should be written down as fully as suggested by him. If his figures should be discounted by as much as fifty per cent., then there should be written off from the eight properties as much as one-half of $24,753,748 (above), or $12,-377,369, which would leave still to be accounted for $10,622,631 in the above round figure of $23,000,000.

This is, of course, a considerable sum of money. Considered in relative terms, however, as expressed by percentages it is a little less than sixteen per cent. of the total appraised value of $66,822,-546. If it should be that the so-called other investments do not have a market value of one hundred per cent. of their face value, and should, therefore, be required to bear the burden of some of the write-off, then the eight plants in question would be relieved proportionately of the write-off burden. In that case the percentage of write-off on the eight plants would be less than the sixteen per cent. just mentioned. As I have before indicated, there is reasonable ground to presume that upon a sale as an entirety of the other assets whose volume is such as is found in this case, a purchaser might insist upon some discount, and a seller in order to make the bulk sale might be entirely willing, in the exercise of all good faith, as well as in business prudence, to give such discount.

By way of a rough check on the reliability of Mr. Brassert's write-off on the appraised values, the following thoughts are suggested by the testimony. Mr. Block, president of the Inland Steel Company testified that—

"highly integrated steel companies, if they are successful, have a capital basis on their ingot production that would range somewheres from $50 to $60 or $65 per ton of ingots, which means that such a concern should have its own supply of ore and coal, pig iron and ingots *and the necessary finishing mills for that production.*"

The words in italics are for the purpose of emphasis because of the criticism made in one of the briefs of Mr. Block's testimony in this regard as applicable to the situation of The Steel and Tube Company of America. (I shall not prolong this opinion by pointing how out the underscored language would remove the chief criticism made with respect to the pertinency of this testi-

mony to The Steel and Tube Company of America situation). Mr. Block further testified that any valuation for a property that would greatly exceed that amount of per ingot capitalization would not be competitive.

Now, let us use this rough method of calculation as a check on Mr. Brassert's testimony. Mr. Brassert knocks off from the appraisal of the eight properties mentioned $24,754,738, which would leave for them a market value of $39,067,798. The eight properties in question do not include the coal mines. Both sides have accepted the appraisal of the coal mines at $2,540,170. Adding the coal mine value to those of the other properties, the total reaches, for all the property supplying ore and coal, pig iron and ingots and the necessary finishing mills, the amount of $41,-607,968. The testimony is, further, that adjusting the surplus pig iron capacity of The Steel and Tube Company of America to an ingot basis, the total ingot capacity of The Steel and Tube Company of America is 800,000 tons, and that as a matter of fact, however, the company has never actually handled over 441,000 tons, or we will say 500,000 tons, in one year. If it be literally conceded that the company is equipped to handle the maximum capacity of 800,000 tons, then the above value arrived at by accepting Mr. Brassert's testimony ($41,607,968) represents a capitalization of ingot production of $52 per ton. If the actual maximum tonnage ever handled in the history of the company be used as the basis, then the value just named is equivalent to an ingot capitalization of over $83 per ton. If the rough method given by Mr. Block for the estimation of the value of a self-contained steel property is reasonably justified, then the values which these properties are to be taken in for at the sales price are thus shown to be fair. I refer to this, not for any purpose of positive demonstration, but simply as a check upon the reliability of Mr. Brassert's testimony in writing down the appraised values.

The testimony shows that Mr. Block estimated the value of the assets of the Inland Steel Company, of which he is president, and that he regards their value as about equal to the value of the assets of The Steel and Tube Company of America. He stated that he would be entirely willing to recommend to his company the sale of its assets at the same figure which the Steel and Tube Com-

pany is to receive for its assets under the contract with The Youngstown Sheet & Tube Company. Mr. Topping, president of the Republic Steel Company, whose book values make a better showing than do those of The Steel and Tube Company of America, testified he would regard a sale of the Republic Steel Company's assets on the same relative basis as the figure named in the contract in question as a fair one, and one which he would recommend to his stockholders to approve. Mr. Topping testifies that the ingot capacity of The Steel and Tube Company of America, taking its properties and investments after depreciation and depletion, is capitalized at $135.30 per ton as against $64.87 for the Republic Steel Company. This is on the basis of 500,000 tons capacity for The Steel and Tube Company of America and 1,260,000 tons for the Republic Steel Company. Translating surplus pig iron capacity into terms of ingots for each company, then on Mr. Topping's calculation the ingot per ton capitalization would be $84.50 for The Steel and Tube Company of America, as against $58 for the Republic Steel Company. This illustrates the relative investment situation existing as between The Steel and Tube Company of America and one of its competitors on the basis of capitalized ingot production, and needless to say shows to the disadvantage of the former.

At an earlier point in this opinion, in connection with what I had to say with respect to the Indiana Harbor plant, it would have been pertinent to make the following observation: The complainants say that if a sum of money were spent in additions and improvements at the Indiana Harbor plant, its earnings would be increased in much larger proportion than the increase in the capital investment. Their witness who spoke with reference to this was Mr. McKee. His testimony on this point is that if $4,000,000 were spent at the Indiana Harbor plant for additional finishing facilities, the capacity of the plant would be increased by 150,000 tons, and that if $2,000,000 more were spent for blast furnaces at Indiana Harbor, $400,000 a year would be saved. These expenditures total $6,000,000. The defendant in replying to this suggestion shows first by Mr. Brassert that if the improvements which Mr. McKee says would cost $4,000,000 were made, the cost figure would in fact be over $11,000,000, and that to install blast furnaces

and integrate the Indiana Harbor plant so as to produce the maximum capacity of 925,000 tons which Mr. McKee's figures point to, would require a total expenditure of $23,850,000. The experts thus very materially differ upon the cost of necessary additional improvements at the Harbor. At this place I may say that all of Mr. McKee's opinions, not only on this point but as well on others, are expressed after a very hurried examination of the vast properties of The Steel and Tube Company of America. For instance, at the Indiana Harbor plant he spent only three hours, and after the spending of this brief period there his opinions were formed. As between the witness Brassert for the defendant and McKee for the complainants, conceding to each an equal degree of expert competency, I think the testimony of Mr. Brassert carries much more weight for the reason that he gave to the plants of The Steel and Tube Company of America rather lengthy study, covering a considerable period of time, whereas Mr. McKee was able to devote as much as only three hours to the largest unit in the whole aggregation.

A second answer, which the defendant makes to the suggestion that additional money if spent at the Indiana Harbor plant would increase its selling value, is that the company does not have the funds, that owing to restrictions in the outstanding mortgages securing bond issues, and to the fact that the preferred stock has been fully sold, no further funds can be realized from the sale of bonds or preferred stock. This means that the common stockholders would have to advance the additional capital to be spent in the way of enlargement and the integration of plant facilties. The common stockholders, with the exception of the complainants, are unwilling to do this. I know of no rule by which it would be fair to appraise the Indiana Harbor property upon the assumption that the common stockholders are bound to invest more money in the venture. I accordingly lay out of all consideration as an element in estimating value what the property could be made to earn if more money were to be invested.

There are other features of evidence relating to this branch of the case which I have not discussed. I refrain from doing so because this opinion will prove inordinately long as it is. Further-

more, I think that the matters which I have in mind are not of sufficient importance for me to spend time in dwelling upon them.

On the whole, I am persuaded that, if the write-downs suggested by the testimony of Mr. Brassert are allowed, the result if it is not correct to the last dollar nevertheless fairly and reasonably approximates what should be taken as the fair selling price of the properties in question. When I say this I have in mind not alone all that I have heretofore said, but as well what follows with respect to the earning power of the company.

I now proceed to examine the question of the earning power, which, as stated by the solicitors for the complainants, is after all the controlling thing.

An examination of this question has involved the study of many tabulations. The complainants have adjusted book values of all properties to the Brassert appraisals and, having done so, have calculated the earnings on the total property investments thus shown. From the years 1913 to 1919, inclusive, they have by a method of calculation arrived at what they claim to be the percentage of earnings on the investment for all properties other than the Indiana Harbor plant, and from the year 1920 to 1922, inclusive, on the investment in all the plants of the company, including the Indiana Harbor plant. The net result of their statement (per Complainant's Exhibit No. 26) is, the following: Plants other than Indiana Harbor and Townsite earned on the investment, before interest and bond discount, 9 per cent. for 1913; 7.5 per cent. for 1914; 11.4 per cent. for 1915; 28 per cent. for 1916; 21.6 per cent. for 1917; 18.2 per cent. for 1918; and 8.3 per cent. for 1919. This is an average for the seven year period of thirteen per cent. on the investment in all properties other than the Indiana Harbor and Townsite plants and before interest and bond discount. It is needless to say, also, it is before dividends on preferred stock. For the three years from 1920 to 1922, inclusive, the complainants' statement also shows earnings on all property, including Indiana Harbor, before interest and bond discount of 9 per cent. for 1920, no showing for 1921, and 2.4 per cent. for 1922. With respect to this it is also needless to say that the earnings referred to are before preferred stock dividends.

On the other hand, the defendant by its calculations from the

books shows earnings after depreciation, taxes and all charges up to interest, but before bond interest and preferred dividends for the five years, 1918 to 1922, inclusive, to be as follows:

1918................................................................. 4.34% of net book values
1919................................................................. 3.02%
1920................................................................. 7.19%
1921 (loss)........................................................ 6.72%
1922 (profit)..................................................... 1.65%

This shows an average for the five years of 1.97 per cent. and an average on the purchase price of $73,000,000 of about two and one-half per cent.

The complainants criticise the selection of the five years, 1918 to 1922, as unfair, because in those five years there were two bad years for the steel industry, viz., the years 1921 and 1922. On the other hand, the defendant criticises the seven year period of 1913 to 1919, inclusive, selected by the complainants, as being unfair because that period embraces the three war years of phenomenal earnings for the iron and steel industry. The statement presented by the complainants of the earnings covering the years just mentioned will disclose that the three years of 1916, 1917, and 1918 supply seventy per cent. of the total earning for the whole seven years. If a portion of 1915 be taken in as a part of the war earning period, which in fairness I think it may, then the phenomenal war earnings would appear to be more than seventy per cent. for the seven year period.

It is doubtless true that each of the parties has selected the years which plausibly present their respective contentions in the most favorable light. I know nothing to do except to take the whole period from 1913 to 1922, inclusive, and average the earnings over the entire period, and in doing so I will take the figures given by the Complainants' Exhibit No. 26 (as adjusted) and the most favorable figures shown in that exhibit for the years 1913 to 1919, inclusive, and the most favorable one shown in that exhibit for the years 1920 to 1922, inclusive. Inasmuch as the exhibit does not show the rate of loss suffered in 1921, I shall accept the defendant's calculation of that rate as correct, viz., 6.72 per cent. On this basis, taking the whole period from 1913 to 1922, inclusive, the average rate of earnings on those properties of the company

shown as investments in the exhibit referred to is 9.48 per cent. before interest and preferred stock dividends. These earnings, of course, are on the investments in the properties listed at book values adjusted where possible to Mr. Brassert's appraisal, and not upon the written-down values contemplated by the sales price named in the proposed contract.

An average yield of 9.48 per cent. would appear to be such a yield as would indicate that the investments are conservatively carried at the book values thus adjusted. This method of presenting the case, however, overlooks important considerations that are connected with the capital structure of the company. The Steel and Tube Company of America has a funded indebtedness outstanding as of January 1, 1923, in the amount of $23,587,406.63, and cumulative seven per cent. preferred stock outstanding in the amount of $16,842,400. Taking the book values after these senior obligations are taken care of, the equity in the assets applicable to the common stock as of December 21, 1922, is about $38,337,000 (I take this figure from Defendant's Exhibit No. 7, which, so far as I can recall, is not disputed). The annual interest charge on the funded indebtedness is $1,465,418.94. The company, as of December 31, 1922, had outstanding bank loans of about $10,000,000, which unless liquidated mean an addition to the annual interest charge of $500,000 or $600,000. The annual requirement for dividends on the seven per cent. cumulative preferred stock is $1,178,968. Leaving out of account interest which the company was required to pay in 1922 on its bank loans, it thus appears that before anything could be earned for the common stock there was a charge for interest on the funded debt and for preferred stock dividends of $2,644,-386.94. In addition to this annual charge for bond interest and preferred stock dividends, there is a further obligation on the part of the company to retire bonds and preferred stocks in large amounts running from the year 1923 to 1954, the requirements in this particular for the year 1923 being $2,659,807.77. This annual charge for retirement is not of importance for the moment for the apparent reason that in proportion as it is met the equity back of the common stock is increased. Danger may, however, lurk in the failure of the company to meet the bond

retirement provisions, because in that event the bondholders have their right to foreclose their mortgage upon complying with the conditions therein described.

With respect to interest and dividend requirements, this is to be said: If there should be a default in interest on the funded debt, the danger of foreclosure would be iminent. If there should be a passing of preferred stock dividends, the worst that could happen with respect to the common stockholder would be that the dividend so passed would immediately become, as against the common stock, a capital liability and the common stock equity would accordingly be reduced. In the statement by the complainants, to which I have above referred, showing the rate of earnings on the property investments, no deduction is made for interest on the funded debt or interest on bank loans, and, of course, none is made for dividends on preferred stock. In order for the statement of earnings to properly and fairly show the earning power of this corporation from the viewpoint of the holder of common stock, there should be first deducted from the earnings interest requirements of all kinds, and secondly, requirements to meet dividends on the preferred stock. If this is done it will then appear that nothing has been earned for the common stock of this company since the year 1920. Starting with the year 1918 the earnings up to and before preferred dividends, as shown by defendant's exhibit No. 7 are, as follows:

| | |
|---|---:|
| 1918 | $1,931,283 |
| 1919 | 1,177,162 |
| 1920 | 5,874,076 |
| 1921 (loss) | 7,800,800 |
| 1922 (loss) | 92,260 |
| Total earnings | $1,089,461 |

The preferred stock dividend requirement for that period was $4,293,880, which means that the preferred stock dividends were not earned by $3,204,400. This is the showing of the defendant. An examination of the Complainants' Exhibit No. 26, though not corresponding exactly with the showing thus made by the defendant, is, nevertheless, in substantial agreement therewith. The preferred stock was issued in 1919. In the phenomenal steel

year of 1920, the earnings were sufficient to cover the dividends on the preferred stock and leave a substantial sum for the common stock. But the dividends on the preferred stock have not been earned since that year. If my recollection serves me correctly, during either the year 1921 or 1922 the company, in order to pay one of its preferred stock dividends, was required to take out of its capital surplus sufficient funds for that purpose. In the history of the company only one dividend has been declared on the common stock. The dividend was $1 a share. I think the evidence fully justifies the statement that the earning power of this corporation, from the viewpoint of the common stockholder, has been exceedingly poor. The complainants in this case are common stockholders. The entire assets are proposed to be sold, and in those assets three classes of persons have a capital interest, viz., bondholders, preferred stockholders and common stockholders. The bondholders and preferred stockholders are making no complaint against the sale. It will pay off their interests in full. The only ones who are objecting are the complainants, who are common stockholders. When the question of fairness of price is under consideration and it is raised by this particular class of parties in interest, I am unable to escape the conclusion that the matter of price is to be passed upon in the light of the interest of the particular class objecting, the interests of the senior classes being provided for at one hundred cents on the dollar. The assets, insofar as the interests of the common stockholders are concerned are assets whose earning power has a proven unsatisfactory record. Since the consolidation in 1919 this earning power has been practically nothing, except for the phenomenal year of 1920. The bank loans required by the necessities of the company have consistently grown until on the 31st day of December, 1922, they amounted to close to $10,000,000.

The complainants very emphatically emphasize the character of current earnings, and they produce figures for the first four months of 1923, showing earnings which, if continued at the present rate, will yield, they say, as much as $8 a share for the common stock at the end of the current year. I do not deem it safe to allow these current earnings very much, if any, weight in the argument. This is for two reasons: First, because no man, of course, can as-

sure their continuance. Thus far the year 1923 is admittedly a boom year in the steel industry. So was 1920. In that year the history of the company shows that for about the first three quarters the current earnings were about as favorable as the current earnings of this year, and yet, in the latter part of 1920, the earnings took flight almost over night and from a very handsome earning condition the company plunged into a period of heavy loss. No witness has assumed to discredit the generally accepted view that the steel business is one of feast or famine, or, as it is said to have been expressed by Mr. Carnegie, one of prince or pauper. The favorable condition of current earnings may end as suddenly as a similar earning condition did in 1920. There is a second reason why I decline to allow serious weight to the showing of the current earnings. That is, that fairness or unfairness of the price named in this contract must be judged in the light of the conditions as they existed at the time of the execution of the contract on January 6, 1923. The officers of the company who entered into the contract on that date may have had reason to believe that the year 1923, upon which we had just entered, might prove much better than the two previous disastrous years. Yet it would be highly unreasonable to exact that their foresight should have been sufficiently keen to foresee what hindsight can now point out.

In the beginning, I said that this sale cannot be regarded as a forced sale. I also said that I would point out circumstances which it seemed to me made it advisable for the seller not to stand resolutely for a price which, if it were differently circumstanced, it might in fairness exact. What I had in mind in making that remark was that at the close of 1922 the financial condition of this company, while not such as to make of it an insolvent, was nevertheless such as to cause very serious apprehension concerning its future. It witnessed the approach of a huge and powerful competition in the person of the United States Steel Corporation, which was building its plant at Gary. The Steel and Tube Company of America is not a concern manufacturing a great diversity of products. Its main product is that of pipe, and its special field was about to be invaded by a very powerful competitor, which promised to be able, because of the perfect integration of its plant, not only to manufacture the specialty of The Steel and Tube Company of

America at cheaper cost, but as well to sustain itself in the periods of depression in that particular field by reason of the diversification of its activities in all branches of the steel trade. Furthermore, the company was admittedly in need of new money. Its financial condition was such as not to permit it to entertain the hope that it might derive funds from additional sales of securities. Its common stockholders, upon whose equity the burden of the company's financial requirements must necessarily fall, were unwilling to risk further money in the venture. Unless its earnings should pick up at a phenomenal rate and be carried consistently at such rate for a number of years, it was apparent it would be in such trouble with bankers who held its paper to the extent of about $10,000,000, and as well with bondholders who were in a position to demand payment on their obligations in the amount of something over $2,000,000 a year, as to cause serious apprehension not only for the fate of the common stock equity but as well for the preferred stock equity.

These circumstances to my mind are such as to clearly point out that while the proposed sale was not a forced one, it was, nevertheless, made under such circumstances as would very legitimately permit of an attractive concession in price, if the same were necessary.

If I have erred in appraising the assets of the company by accepting a very considerable portion of the write-offs from Mr. Brassert's appraisals, as contended for by the defendant, the earning power of the common stock equity is shown to have been such as to justify me in believing that any apparent error in this regard has been more than offset and removed as real. My conclusion is, that under the evidence the price at which it is proposed to sell the assets of the corporation represents their fair value and is adequate. At all events, I am strongly persuaded that if the price is inadequate according to some standard of measure absolute in its precision, a standard which no man can supply, there is no such inadequacy as indicates wrong or unfairness towards the complainants; for, having no such perfect standard by which to measure, the possible inadequacy is such as must, in my opinion, consist with honesty of judgment and an intent to obtain the best possible price.

Under the evidence before me, I am constrained to the conclusion that the terms and conditions of the proposed sale are expedient and for the best interests of the corporation.   The outstanding injunction will, therefore, be dissolved.

Note: Subsequent to the foregoing opinion a motion was made for a preliminary injunction, which was denied (see *post p.* 117), and the bill was thereafter dismissed on motion of the complainants (see post p. 368).