HARVEY ALCOTT, ROSE E. ALCOTT, DALE DISTRIBUTING CO., INC., MORICE HAYMES, SIDNEY SUSWEIN and MORTON MAINZER, suing individually and as stockholders of P. R. M., Inc., (formerly Associated Artists Productions Corp.) and on behalf of themselves and other stockholders of P. R. M., Inc., (formerly Associated Artists Productions Corp.), similarly situated, and in the right of P. R. M., Inc., (formerly Associated Artists Productions Corp.),

Plaintiffs,

*vs.*

ELIOT HYMAN, P. R. M., INC., (formerly Associated Artists Productions Corp.), a corporation of the State of Delaware, UNITED ARTISTS ASSOCIATED, INC., a corporation of the State *of Delaware,* and GOTHAM TELEVISION FILM CORPORATION, a corporation of the State of Delaware,

Defendants.

*New Castle, August 22, 1962.*

*Hugh M. Morris* and *William S. Megonigal, Jr.,* of Morris, Nichols, Arsht & Tunnell, Wilmington, *Burton H. Brody* of Galef & Jacobs, and Davies, Hardy & Schenck, New York City, for plaintiffs.

*Louis J. Finger,* of Richards, Layton & Finger, Wilmington, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants United Artists Associated Inc. and Gotham Television Film Corp.

*Louis J. Finger,* of Richards, Layton & Finger, Wilmington, and Stillman & Stillman, New York City, for defendant Eliot Hyman.

MARVEL, Vice Chancellor: Plaintiffs sue derivatively as well as individually in their capacity as stockholders of P. R. M., Inc., a corporation known as Associated Artists Production Corp. at the time the matters complained of were consummated. Their complaint primarily seeks an order rescinding the sale of virtually all of the

assets of Associated Artists (Associated) to the defendant United Artists Associated, Inc. (United). Additional relief is also sought in the form of an accounting from the defendants Eliot Hyman and United, the declaration of a trust in favor of plaintiffs and members of their class in the assets of Associated now held by United, and other relief of a similar nature. The granting of such relief against United would have the effect of establishing plaintiffs' and other non-assenting stockholders' claimed aliquot interests in the tangible assets of their corporation now held by United, either through a distribution to plaintiffs and others similarly situated of a pro-rated number of shares of stock of United, or the awarding of damages equivalent to such claimed interests. Finally, plaintiffs seek rescission of the sale to United of certain shares of Associated and pray for the granting of appropriate relief on such cause of action either in the form of damages or by means of the allocation to them of shares of stock. Each of the plaintiffs concedes that some part of their stockholdings in Associated, as of the period immediately preceding the date of the transaction complained of, was surrendered to the defendant United before the bringing of this action but take the position that such surrenders do not serve to estop them from bringing this action inasmuch as they were made under protest and were in fact compelled by the very nature of the unlawful acts complained of. Compare *Abelow v. Symonds*, 38 *Del.Ch.* 572, 156 *A.2d* 416, and *Lebold v. Inland Steel Co. (C.A. 7)*, 125 *F.2d* 369.

Prior to argument on the pending crossmotions for summary judgment, plaintiffs sought to examine the books and records of United for a period subsequent to the transaction complained of for the purpose of establishing retrospectively the inadequacy of the cash amounts made available to Associated's stockholders as a result of the corporate acts complained of. However, plaintiffs' *Rule* 34, *Del.C.Ann.*, motion was denied on the grounds that the fairness of the unusual transaction here under attack must be judged as of the time it was made rather than in the light of the earnings made from the assets after they had been sold, *Allied Chemical & Dye Corporation v. Steel and Tube Co.*, 14 *Del.Ch.* 64, 122 *A.* 142.

The history of Associated is in brief as follows. It was formed in 1920 under the corporate name of American Bushings Corporation

(later changed to Pressed Metals of America, Inc.) for the purpose of engaging in the manufacture of automotive parts. However, in 1956, upon the acquisition from the defendant Eliot Hyman of all of the outstanding stock of a corporation known as Associated Artists Production, Inc., the corporate name Associated Artists Productions Corp. was adopted, and the corporation entered into the principal business of owning and managing libraries of motion picture films. These properties, at the time of the matters here complained of, consisted of feature films produced by Warner Brothers dating for the most part from 1919, but including a few so-called feature films released as late as 1949. Also included in the corporation's film library were a number of "Popeye" cartoons produced by Paramount. An exact value for these films as of the time of the matters complained of cannot be precisely fixed, but for the most part the films were old and had value for television projection only so long as the motion picture industry continued to withhold recently made films from television broadcast.

During the latter part of 1957, however, Mr. Robert S. Benjamin and Mr. Arthur B. Krim, two of the principal executives of United Artists Corporation, one of the country's leading producers and distributors of motion pictures, and which had also become involved in the business of telecasting feature films and animated cartoons, became interested in acquiring Associated's assets at a fair price. In fact, according to a September 1958 report to the stockholders of Associated mailed out in conjunction with United's later solicitation of tenders of stock, the soliciting corporation was formed by United Artists Corporation for the very purpose of acquiring such assets. The plan of acquisition, as ultimately adopted, was one which envisioned the purchase by United of the stock of Associated followed by the use of such stock as consideration for the purchase of substantially all of such latter corporation's assets. The end result contemplated in this unusual transaction was to leave Associated with cash as its sole asset. Such corporation, under the terms of the proposed transaction would also have no liabilities after its consummation but would be bound by a covenant not to liquidate for five years. An important element in the complex arrangement was

the fact that no taxable gain would be incurred by Associated on the portion of its assets to be transferred to United.

Extended negotiations were then entered into between United Artists Corporation and Associated's principal stockholders, Louis Chesler and Maxwell Goldhar, who with certain associates owned or controlled forty one percent of the stock of such corporation and who were also at the time negotiating with other possible purchasers of their stock. The end result of such negotiations was that after litigation and renegotiation of the terms of such proposed purchase, the stock of such persons was in fact acquired by United Artists Corporation's wholly owned subsidiary, Gotham Film Television Corporation. However, in order for there to be adequate consideration in the form of stock to be paid over in exchange for Associated's assets it was necessary to acquire substantial amounts of stock from stockholders of Associated other than Messrs. Chesler and Goldhar and their associates. Accordingly, the offer made for the 700,000 shares of Associated owned by the Chesler-Goldhar group, namely six dollars per share in cash and a promise to deliver another six dollars per share in the form of debentures or notes, was made to all other stockholders of United on the condition that least 80% of the issued and outstanding stock of Associated should become available to United as a result of such solicitation. In the meantime, however, National Telefilm Associates, Inc., which has also been attempting to acquire control of Associated's film libraries and which claimed to hold contracts for the purchase of the stock held by the Chesler-Goldhar group, sought and obtained injunctive relief against consummation of sale of their stock to United as originally proposed. The proposed transaction between United and the Chester Goldhar group was, as indicated above, then renegotiated and substantially better terms for the stockholders of Associated were achieved, the price for the stock held by Messrs. Chesler and Goldhar being fixed at $10.62 per share and for that of their associates, a price of $11.19 per share. Thereupon, a detailed report was prepared by United and mailed out to all of its stockholders. In it the proposal was made that if the stipulated number of shares of the outstanding stock of Associated were to be tendered pursuant to the offer and provided approval of the proposed transaction were to be given by the directors,

stockholders, and debenture holders of Associated, United would purchase all tendered stock for the purpose of using such stock and cash as needed to purchase substantially all of the assets of Associated. United also offered to assume all of the liabilities of Associated. The amount of cash to be paid over in connection with the sale was calculated so as to assure that Associated would have sufficient cash on hand to redeem all debentures not tendered in response to the offer for tenders as well as the sum of $11.19 for each share of stock left outstanding. This proposal was promptly approved by the directors of Associated, by the debenture holders, and finally by the stockholders, who, at a special meeting held on October 16, 1958, voted 1,590,040 shares in favor of the plan and 5,556 shares against, there being at the time 2,112,484 shares outstanding and entitled to vote. Of the shares voted for the plan, 837,352 were owned by the purchaser, Gotham, however, 752,588 shares held by stockholders not connected with the purchaser were also voted in favor of the plan. There were in addition 516,888 shares outstanding which were not voted for or against the plan. Finally, 124,000 shares owned by the defendant Hyman, which were, of course, subject to tender at the same price offered to the other stockholders, were voted in favor of the United's proposal. Thereafter, tenders ensued, and after Mr. Justice Greenberg of the Supreme Court of New York had declined to grant the present plaintiffs' motion for an order temporarily enjoining consummation of the transaction[1], United delivered the stock it had purchased from the stockholders of Associated and received in return the assets of such corporation, delivering at the same time sufficient cash to cover the claimed value of the securities which had not been tendered, including the total amount of $1,949,734 allocable at $11.19 per share to the 174,239 shares of Associated still outstanding.

Plaintiffs claim that the net result of this complex transaction was to leave them and other non-assenting stockholders frozen out of what had been a profitable business so that on its consummation they merely held an equity in the shell of a once going business, the assets of which had been entirely converted to cash in an amount sufficient to cover the stipulated price already paid to the assenting

1. *Alcott v. Hyman* (*Sup.Ct.N.Y.*), 5 *Misc.* 1033, 183 *N.Y.S.2d* 359.

stockholders. Plaintiffs further claim that such price of $11.19 per share was grossly inadequate in the light of Associated's earnings and future potential. It is also implied that the large stockholders, Chesler and Goldhar, had reasons for selling their stock which were unrelated to its true value.

Both plaintiffs and the defendants against whom relief is sought have moved for summary judgment. Plaintiffs' motion is limited to an application for judgment in their favor on the issue of liability, while the moving defendants seek an order of dismissal. Defendants contend that the transaction under attack now only technically complies with the provisions of the Delaware Corporation Law which permit a corporation to use its property to purchase its own shares (§ 160 *Title* 8 *Del-C.*) but also fully meets the requirements of the section of the Delaware law governing sales of corporate assets[2] (§ 271 *Title* 8 *Del.C.*). While no Delaware precedent authorizing the sale of substantially all of a corporation's assets for consideration consisting entirely of its own stock has been cited or found, I am satisfied that the phrase "stock * * * of, any other corporation or corporations * * *", which plaintiffs contend excludes use of the stock of the very corporation whose assets are being sold, found in § 271 of *Title* 8 *Del.C.*, was added in response to dictum on the subject found in Chancellor Wolcott's opinion in *Finch v. Warrior Cement Corp.*, 16 *Del. Ch.* 44, 141 *A.* 54. In the cited case, the Chancellor clearly indicated that the sale of a corporation's assets in return for stock of another corporation was permissible under the terms of § 271 *of Title 8 Del.C.* as then constituted. He held, however, that in such event the consideration for the sale must be delivered to the selling corporation directly and not to its stockholders if a de facto merger were to be avoided. See also *Butler v. New Keystone Copper Company*, 10 *Del.Ch.* 371, 93 *A.* 380. The Finch opinion was handed down in February 1928. The 1929 amendment of the Legislature, in my opinion, was not intended to restrict but rather to make

2. "Every corporation * * * may at any meeting of its board of directors, sell * * * all of its property and assets, * * * upon such terms and conditions and for such consideration, which may be in whole or in part shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interests of the corporation * * *" when authorized by a majority of the voting stock.

explicit what had been implied in the Court's opinion. It should not therefore be construed as "expressio unius est exclusio alterius".

I conclude therefore that first there is no statutory limitation in Delaware (other than that capital must not be impaired) on the right of a corporation to apply its property for the purchase of its own stock. Secondly, there is no statutory limitation on the right of a Delaware corporation to sell its assets on such terms and conditions and for such consideration as its board of directors deems expedient and for the best interests of the corporation. So that insofar as § 160 *of Title* 8 *Del.C.* is concerned, absent a showing that its own shares have been caused to be purchased by a corporation for an improper purpose, *Propp v. Sadacca, ante p.* 113, 175 *A.2d* 33, courts should not normally interfere with such a transaction when carried out in compliance with the statute. Similarly, in transactions consummated in compliance with the terms of § 271 *of Title* 8 *Del.C.*, unless the price fixed for the sale of corporate assets is shockingly disproportionate to their actual value or the terms of such a transaction are in some other way injurious to the rights of creditors and stockholders of the selling corporation, shareholders of the selling corporation must accept the results of such a sale. Compare *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.* 1, 120 *A.* 486, and *Hariton v. Arco, ante p.* 326, 182 *A.2d* 22.

Defendants therefore argue that despite the complex nature of the attack here made on a transaction in which the rights of creditors were adequately protected, what plaintiffs really complain of is that inadequate consideration was given for the purchased assets. Defendants contend that the burden of such attack cannot be successfully carried for several reasons, including stockholder ratification, *Schiff v. RKO Pictures,* 34 *Del.Ch.* 329, 104 *A.2d* 267, and plaintiffs' failure to submit evidence to counter that introduced by defendants in support of their motion, *Lewis v. Hat Corporation of America,* 38 *Del. Ch.* 313, 150 *A.2d* 750. Furthermore, defendants contend that the case at bar does not pose the problems inherent in a situation involving a sale to an insider inasmuch as United Artists Corporation first negotiated as an outsider with the dominant stockholders of Associated for the purchase of their shares. Terms for the purchase of such persons' stock having been finally agreed on, such terms were promptly offered

to all other stockholders of Associated. For these reasons, defendants, who to succeed must necessarily rely on the adequacy of the price offered for the purchase of the shares of Associated to establish a fair price for its assets (a reasonable transmutation in light of the nature of the assets involved and the buyer's assumption of the seller's liabilities) submit that this Court must hesitate to delve into the adequacy of the price paid for the assets in question, there being no showing that there was to any extent a gift of assets. Notwithstanding these contentions, defendants further argue that even were the case actually one concerned with a sale to an insider, no real disparity between the price paid and the value of the assets sold has been shown, *Lewis v. Hat Corporation, supra.* And even though the defendant Hyman became a director and president of the purchasing corporation it has been held that the fact that an officer of the selling corporation becomes a director and later an officer of the buying corporation at the same salary will not in itself nullify a sale of assets, *Mitchell v. Highland-Western Glass Co.,* 19 *Del.Ch.* 326, 167 *A.* 831.

Defendants' basic position, however, is that the price paid for the stock of Associated and thus for its assets was arrived at as a result of arm's length bargaining which fixed a price for Associated's stock in excess of its market price as of any time during the year preceding the transaction and double the book value per share of the stock as of June 30, 1958 and that regardless of the interest of the defendant Hyman and others associated with him in United, the price offered plaintiffs and all other stockholders was eminently fair. They also stress favorable board action, stockholder ratification of the actual sale of assets, even though it is conceded that Associated's president, Mr. Eliot Hyman, its secretary and treasurer, Mr. Zittou, as well as its employee, Mr. Kenneth Hyman, were at the time of the transaction under attack also directors and officers of United. Finally, defendants point out that by first purchasing most of the shares of Associated rather than directly buying its assets, all of the stockholders of the corporation were relieved of a possible tax burden of some $3,000,000 which would have been imposed had Associated's asset been directly purchased for cash.

Admittedly, plaintiffs have introduced no solid evidence concerning stock or asset values which is at odds with that relied on by de-

fendants, resting their case primarily on technical contentions and economic projections. They do contend, however, that the data submitted to Associated's stockholders was, to say the least, misleading, and give to it interpretations other than those made by defendants. I am not persuaded, however, that any essential information about the transaction was omitted from such document, the report having gone into intricate details of the proposal, including the possibility that Mr. Hyman, because of tax considerations, might not tender his Associated stock and thus upon consummation of the proposed transaction become the controlling stockholder of such corporation while continuing to serve as president of United.

Plaintiffs, on the other hand, deny that the price paid for Associated's shares was actually bargained for and stress the absence of an independent appraisal. I am satisfied, however, that the purchase of the Chesler-Goldhar stock was consummated only after strenuous competitive efforts and in fact only after the settlement of litigation instituted by National Telefilm Associated, Inc., which was also seeking to acquire such shares. Arm's length bargaining is a time-tested method of arriving at a fair price, *Allied Chemical & Dye Corp. v. Steel and Tube Co.*, 14 *Del.Ch.* 64, 122 *A.* 142, and I am satisfied that a fair price was so arrived at as a result of bargaining for the Chesler-Goldhar shares. In the cited case Chancellor Josiah Wolcott in considering the problem of deciding what is a fair price in a sale said inter alia:

> "There are, of course, many factors that enter into what may be a fair price in a given case for a seller to take and for a purchaser to pay. But fundamentally the fair price is the resultant of the two opposing views of a willing seller and a willing purchaser, the former of whom is not compelled to sell and the latter of whom is not required to buy."

Next plaintiffs label Mr. Hyman's failure to tender his stock for personal tax reasons as special treatment which invalidates the transaction complained of. However, all other stockholders, including plaintiffs, had the same right to remain stockholders. Finally, plaintiffs' contentions about the price range of the market value of the stock of Associated and the financing of the transaction are clearly at odds

with the actual facts. In short, plaintiffs' contentions as to the alleged unfairness of the transaction are not sustained by the evidence of record. *Lewis v. Hat Corporation of America, supra.*

Plaintiffs' second basic line of attack, as indicated earlier in this opinion, follows a more technical line. First, they cite Article Fourth of Associated's certificate of incorporation which provides that "* * * In the event of any liquidation or winding up of the Corporation or distribution of the assets by way of return of capital * * *" the common stockholders "* * * shall be entitled to receive and shall receive the complete distribution of the assets of the Corporation in pari passu."

Relying on this article, plaintiffs submit that the transaction under attack was in fact a winding up and that since there was not a complete distribution of Associated's assets in pari passu, the transaction complained of was ultra vires. However, the inevitable legal result of a sale of corporate assets is not necessarily a complete liquidation, *Levin v. Pittsburg United Corp.*, 330 *Pa.* 457, 199 *A.* 332, and *Goldman v. Postal Telegraph (Dist.Ct.Del.)* 52 *F.Supp.* 763. More to the point, there has been no showing by plaintiffs that in the language of Article Fourth a "* * * distribution of assets by way of return of capital * * *" here occurred.

Plaintiffs next reiterate their earlier contention that the transaction complained of was actually a de facto merger and that they are accordingly entitled to an appraisal. However, the transaction under attack, which I have held meets the statutory requirements of both §§ 160 and 271 of *Title* 8 *Del.C.*, was not one in which an exchange of shares of stock of a going concern for shares in another going concern was proposed, *Sterling v. Mayflower Hotel Corp.*, 33 *Del.Ch.* 293, 93 *A.2d* 107, 38 *A.L.R.2d* 425. In fact, plaintiffs continue to hold stock in their own corporation. Nor does the transaction complained of demonstrate other indicia of a merger, *Heilbrunn v. Sun Chemical Corp.*, 38 *Del.Ch.* 321, 150 *A.2d* 755. On the contrary, its form in all respects meets the technical requirements of § 271 of *Title* 8 *Del.C., Hariton v. Arco Electronics, Inc., supra*, an action instituted by a stockholder of a corporation which had contracted to sell its assets. While plaintiffs' contentions are not without appeal, they

should be addressed, as was decided in the cited case, to the legislative rather than the judicial branch of the government. Concededly, as noted earlier in this opinion, no precise precedent has been cited or found to support the unusual two-step procedure here followed other than the approval given it by Mr. Justice Greenberg in *Alcott v. Hyman, supra*. However, as I have indicated above, I am of the opinion that the intentionally broad powers found in the Delaware statutory law on the related subjects of a corporation's right to purchase its own stock and to sell its assets clearly support the procedural steps taken to consummate the transaction complained of, the 1929 amendment to § 271 of *Title* 8 *Del.C.* not having been adopted for the purpose of narrowing the scope of such statute, "Investors and the *Revised Delaware Corporation Act," A. A. Berle, Jr., 29 Col.L.Review*, 653.

Turning briefly to the question of burden of proof and assuming but not deciding that the board of directors of both the selling and purchasing corporations were not only ultimately dominated by United Artists Corporation but that the majority of the outstanding stock voted in favor of the proposition was not entirely independent in the true sense of the word, nonetheless I must conclude on the present record that defendants here dealt with minority stockholders "* * * in a scrupulously fair manner and in accordance with the highest morals of the market place * * *", *Alcott v. Hyman, supra.* Compare *Gottlieb v. Heyden Chemical Corp.*, 33 *Del.Ch.* 177, 91 *A.2d* 57, and *Schiff v. RKO Pictures, supra.* However, the acquisition of the shares of the Chesler-Goldhar group by Gotham having been an integral part of the transaction here complained of and such shares having been acquired at virtually the same price offered all other shareholders, they should not in my opinion be disqualified from being counted. Had the Chesler-Goldhar group held its shares until the overall transaction was about to be consummated, the result would have been the same. Furthermore, while the defendant Hyman was at the time of the vote the president of the purchasing corporation, following the transaction his salary at United remained the same as previously paid him by Associated. And while he did not tender his shares, no valid reason has been advanced why he as the holder of 124,000 shares of Associated stock should have voted against his own

interests, *Mitchell v. Highland-Western Glass Co.*, 19 *Del.Ch.* 326, 167 *A.* 831 and *Cottrell v. Pawcatuck Company*, 34 *Del.Ch.* 528, 128 *A.2d* 225.

Finally, it should be noted that had the assets of Associated been directly purchased for a sum roughly equivalent to the total amount here paid out or held for individual stockholders, the transaction would have no doubt withstood stockholder attack, although, because such a transaction would have been taxable the net thereafter received by Associated's stockholders would have been less.

There being therefore not only no basis for invalidating the transaction complained of on strictly statutory grounds but no proper evidence that the value of the consideration tendered for Associated's stock was not altogether fair and reasonable in amount, I conclude that plaintiffs' two basic lines of attack have failed of their object.

In conclusion, plaintiffs argue generally that corporations in any event may not resort to ingenious corporate acts not expressly authorized by statute and that the transaction at bar is accordingly ultra vires for this reason. The short answer to such contention is that the laws of Delaware, in my opinion, do permit what has been accomplished in the case at bar, and, as noted earlier, defendants observed such statutory requirements in presenting a reasonable proposal in a fair manner to Associated general stockholders. Finally, nothing was in fact appropriated by Associated's majority stockholders. In short, plaintiffs have not on any of the many theories advanced in their briefs succeeded in establishing that the sale of assets here in issue, though not desired by plaintiffs, was either in violation of the applicable terms of the Delaware Corporation Law or made for inadequate consideration. In view of the conclusions herein reached, it has not been necessary to consider the defense of laches.

On notice, an order may be submitted granting the moving defendants' motion for summary judgment and denying plaintiffs' motion that the moving defendants be directed to account to plaintiffs for damages allegedly suffered by them as a result of the transaction complained of.