NOT DESIGNATED FOR PUBLICATION

No. 126,957

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BRADLEY A. BERGMAN,
*Appellant*,

v.

MARK E. EVEANS, JAMES M. KLEIN, LEONARD C. MITCHELL,
and SHARON L. DIVINE,
*Appellees*.

MEMORANDUM OPINION

Appeal from Johnson District Court; RHONDA K. MASON, judge. Submitted without oral argument. Opinion filed September 26, 2025. Affirmed.

*Matthew T. Geiger*, of GeigerLaw, LLC, of Stilwell, for appellant.

*Michael R. Owens* and *John M. Edgar*, pro hac vice, of Edgar Law Firm LLC, of Kansas City, Missouri, for appellees.

Before HURST, P.J., ISHERWOOD and PICKERING, JJ.

PER CURIAM: This is a breach of contract case that considers a right of first refusal (ROFR) in an Amended and Restated Stock Redemption Agreement (Amended Agreement). Meritage Portfolio Management, Inc. (Meritage), entered into the Amended Agreement along with stockholders Mark Eveans, James Klein, Bradley Bergman, Leonard Mitchell, and Sharon Divine. The Amended Agreement included a ROFR giving Bergman the right to buy shares of stock if the other stockholders offered shares for sale. Bergman sued the other stockholders—Eveans, Klein, Mitchell, and Divine (the

1

defendants)—for breach of contract, alleging that they violated the Amended Agreement by considering a proposed asset sale/transfer between Meritage and a third-party buyer.

The district court initially granted a temporary injunction to Bergman, halting the transaction. The parties then filed cross-motions for summary judgment. The district court granted the defendants' motion and denied Bergman's motion. Although Bergman appeals the denial of his motion for summary judgment, his arguments on appeal focus on the district court's granting of the defendants' motion. Bergman also contends that the district court erred when it concluded that the ROFR was not triggered because the Amended Agreement unambiguously stated that the ROFR applied only if common stock were offered for sale by a stockholder. He argues that the contract is ambiguous and the issue of breach is a question of fact for the fact-finder to resolve.

Upon review, we affirm the district court's ruling, which found the Amended Agreement to be unambiguous and the ROFR is only triggered when a stockholder transfers shares of stock in Meritage, not when the corporation considers an asset sale.

FACTUAL AND PROCEDURAL BACKGROUND

Meritage is a closely held corporation operating as a registered investment advisor (RIA) in Overland Park. The parties to this appeal are the stockholders of Meritage. Bergman owns 6.59% of shares. Eveans is the majority shareholder with 51.03% of shares. Klein owns 33.36% of shares, Mitchell owns 6.01% of shares, and Divine owns 3.01% of shares. Meritage's board of directors comprises Eveans, Klein, and Bergman's representative, Stacey Perry.

In 2003, Meritage's "Stock Redemption Agreement" (Agreement) was executed when Bergman originally purchased 237 shares, or 6.59% of shares, and simultaneously purchased 100% of Midwest Trust Company (then known as EBK Trust Company).

2

Bergman testified that he purchased the stock in Meritage because he "needed a position in the RIA" to protect the revenue stream to his newly acquired trust company.

As later explained at a court hearing, a trust company differs from an RIA in that the trust company is a custodian of the assets, and an RIA does the investing. There is a revenue stream from an RIA to the custodian. Ultimately, however, the choice of which custodian to use is left to the client, not an RIA.

The Agreement was amended in 2007 to add two minority shareholders, Mitchell and Divine. This breach of contract dispute concerns Section 5, a ROFR provision, in the Amended Agreement executed by the parties in 2007. The ROFR provision was in both the 2003 Agreement and the 2007 Amended Agreement and contained the same language in both agreements.

Bergman testified that he would not have purchased Midwest Trust without the adjacent ROFR in the agreements. Section 5 of the Agreement and the Amended Agreement stated:

> "Notwithstanding anything to the contrary in Articles 3 or 4 of this Agreement, Bergman shall have an irrevocable option to purchase all shares of Stock either offered for sale by any Stockholder or to be redeemed by the Company at the same price and on the same terms and conditions of the proposed sale or redemption (the 'Bergman ROFR'); provided however that, in the event that any Stock owned by Eveans ('Eveans Shares') is to be redeemed by the Company or offered for sale to the Stockholders pursuant to Section 3.3(b), the number of Eveans Shares that Bergman may purchase pursuant to the Bergman ROFR shall be limited to a number such that Bergman would own 50% of the outstanding Stock after exercising the Bergman ROFR, and Klein shall have the option to purchase any of the Eveans Shares not purchased by Bergman pursuant to the Bergman ROFR."

3

In the Amended Agreement, "'Stock'" was defined as "the common stock of the Company, par value $1.00 per share." "'Company'" was defined as "Meritage Portfolio Management, Inc., a Kansas corporation." "'Stockholder'" was defined as "any Person who executes this Agreement as a stockholder." As the appellees' briefing notes, the Amended Agreement used the terms "Stock" or "Stockholder" over 250 times, while the term "equity" is not referenced in the agreement.

In July 2019, Meritage initiated Project Sonoma and retained Park Sutton Advisors to search for potential business transactions involving Meritage. In an internal email, Deborah Eveans, a Meritage officer and wife of director and stockholder Eveans, wrote to the majority stockholders and emphasized that a transaction would be "a sale of business assets" and "not a merger" or "a stock transaction." "Both of those," she wrote, "would imply that Bergman's ROFR is triggered and we don't want to imply that in any way."

Project Sonoma resulted in multiple offers. One offer was from CI Financial, a Canadian wealth management company. In its initial proposal, CI Financial sent an indication of interest to acquire 100% of the outstanding equity of Meritage. Deborah emailed Meritage's corporate counsel on October 7, 2020, indicating that Meritage had asked CI Financial to reconsider their offer as an asset sale rather than an equity sale. Bergman wrote to the other stockholders on October 16, 2020, and offered to acquire all outstanding shares of Meritage.

On October 27, 2020, CI Financial wrote to Park Sutton Advisors with another indication of interest, this time "for the purchase of substantially all of the assets of Meritage . . . ." On November 2, 2020, Bergman wrote to the Meritage Board of Directors and Park Sutton Advisors with a second offer to acquire all the outstanding shares of Meritage. On December 1, 2020, Bergman petitioned for breach of contract, breach of fiduciary duties, and civil conspiracy, claiming that Eveans and Klein were

4

considering asset sales "with the specific intent and purpose of circumventing the Bergman ROFR."

On February 25, 2021, CI Financial extended a draft Membership Interest Purchase Agreement to Meritage's corporate counsel for review. The draft agreement outlined the proposed deal as follows:

> "WHEREAS, immediately prior to the Closing, Seller will undertake a corporate restructuring (collectively, the 'Pre-Closing Restructuring') whereby (a) Seller will cause to be formed [ ], LLC, a Delaware limited liability company (the 'Company'), (b) Seller and the Company will enter into a Contribution Agreement, substantially in the form attached hereto as Exhibit B (the 'Contribution Agreement'), pursuant to which, effective immediately prior to Closing, Seller will contribute to the Company certain assets and liabilities of Seller, the Company will assume certain assets and liabilities of Seller (the 'Contribution'), and in exchange the Company will issue one hundred percent (100%) of its outstanding membership interests (the 'Membership Interests') to Seller, and (c) Seller will enter into the Limited Liability Company Agreement of the Company, in the form attached hereto as Exhibit C (the 'LLC Agreement');
> . . . .
> "WHEREAS, following the consummation of the Pre-Closing Restructuring, Seller desires to sell to Purchaser and Purchaser desires to purchase, on the terms and subject to the conditions set forth in this Agreement, one hundred percent (100%) of the Membership Interests (the 'Purchased Interests')."

According to Eveans, who testified about the proposed deal with CI Financial, the first step was that Meritage would form a new subsidiary LLC, which would be a wholly owned subsidiary of Meritage—in other words, an asset of Meritage. The next step was Meritage would transfer ownership of its assets to the newly formed LLC, and the newly formed LLC would then transfer all of its membership interests to Meritage. CI Financial then would buy the newly formed LLC from Meritage.

Meritage's corporate counsel emailed Eveans, Klein, and Deborah on March 20, 2021, with an amended agreement where the title was changed to Purchase Agreement by redlining the words Membership Interest. The structure of the deal remained the same. Several days later, Meritage's corporate counsel emailed Eveans, Klein, and Deborah with another amended agreement, this time adding the word Asset to the title, making it Asset Purchase Agreement. Again, the structure of the deal remained unchanged.

On October 4, 2021, a special board meeting the following month to vote on the Asset Purchase Agreement with CI Financial was announced. The next day, Bergman filed a motion for temporary injunction. The district court held a hearing on the motion on November 10, 2021. Bergman, Eveans, Klein, Mitchell, and Divine testified. The defendants retained an expert, Matthew Crow, to testify about the nature of the proposed deal with CI Financial.

Bergman testified that he would not have purchased the trust company or the shares in Meritage without the Amended Agreement's Section 5 ROFR. He also testified that he would not have signed the Agreement or the Amended Agreement without a provision requiring specific performance upon breach.

Bergman also testified that Eveans and Klein were not initially forthcoming about Project Sonoma. Rather, Bergman had to exercise his legal rights as a stockholder under Kansas law five times to request books and records about the transaction before involving an attorney. Bergman testified that he was willing and able to match the offer from CI Financial, stating that he was exercising his right of first refusal right then in court. He said that if the CI Financial deal closed as contemplated by the Asset Purchase Agreement, his right of first refusal would be "completely worthless."

Under cross-examination, Bergman admitted that if the CI Financial deal closed, he would still own his shares in Meritage, as would the other stockholders. Thus, he

6

would have retained his pro rata ownership of the $33 million in consideration Meritage would have received under the CI Financial deal.

Eveans testified that he informed Park Sutton Advisors that the Bergman ROFR was a right of first refusal on equity, meaning ownership. He agreed that any "sale of equity triggers the Bergman right of first refusal," but stated that "[n]obody has agreed to sell equity." Eveans stated that an asset sale would not trigger the ROFR. Eveans agreed that CI Financial was not buying the assets transferred into the new LLC but was buying the membership units in the new LLC. He then explained that the newly formed LLC would itself become an asset of Meritage. When asked whether he intended "to honor the right of first refusal" Bergman asserted in court during the hearing, Eveans responded, "I take the position, a very strong position, that the right of first refusal he proposes is not met at all." Eveans testified that he had never offered his stock for sale.

Klein testified that, based on a prior conversation he had with Bergman, he realized that the board would be unable to make any decision about Meritage's future involving equity because it would not have unanimous consent as Bergman would not sell his shares. Klein stated the reason the board did not consider Bergman's offers to acquire stock was because "the board doesn't have any powers on contemplating an offer to the shareholders." Klein explained that if Meritage were to place all of its assets in a subsidiary LLC owned by Meritage, then Meritage's membership interest in that LLC would be considered an asset. Klein also noted that IRS regulations prohibit foreign companies from owning stock in subchapter S corporations, of which Meritage is one. Therefore, he testified, an asset sale to CI Financial was the only type of transaction Meritage could pursue with them. Klein confirmed that he did not offer to sell his stock in Meritage to anyone.

For the defense, Matthew Crow, the president of Mercer Capital, testified. Mercer Capital is a business valuation and corporate finance consulting firm. Crow stated he was

engaged to examine the CI Financial transaction structure in the Asset Purchase Agreement and determine whether it was common. He concluded it was "pretty standard."

Crow explained the difference between a subchapter C corporation and a subchapter S corporation. C corporations pay federal and state taxes on the business' earnings. They can accept any shareholder and be publicly traded. In contrast, S corporations only pay tax when the shareholders pay taxes on their individual earnings on a pro rata basis. Meritage is an S corporation. Crow added that not everyone can be a shareholder in an S corporation.

Crow explained that because S corporation shareholders must be domestic individuals and not foreign nationals or corporations, transactions involving S corporations are typically structured as asset sales compared to stock sales. Therefore, "CI Financial couldn't buy stock in an S Corp. if it wanted to." Crow concluded that buyers tend to prefer asset sales because of the tax treatment, and sellers are indifferent whether a deal is a stock sale or an asset sale. Crow also analyzed the value of the CI Financial transaction versus the Bergman offers made in October and November of 2020 and concluded that the CI Financial transaction would result in more compensation to Meritage than the Bergman offer would to the stockholders. On cross-examination, Crow reiterated that in the CI Financial Asset Purchase Agreement, the newly formed LLC would be a wholly owned subsidiary of Meritage, which would be property owned by Meritage.

After the hearing on Bergman's motion for temporary injunction, Bergman amended his petition to include just a single claim of breach of contract.

The district court granted Bergman a temporary injunction on November 17, 2021. It concluded that Bergman had "a substantial likelihood of eventually prevailing on the

merits of his breach of contract claim." The order stated: "Regardless of labels, the Court concludes the proposed transaction with CI Financial is a sale of equity ownership which triggers the Bergman ROFR." The court then "enjoined and prohibited" Eveans, Klein, Mitchell, and Divine from:

"1.     Voting as directors or stockholders to approve a sale to CI Financial, its subsidiaries, or its affiliates;

"2.     Executing as directors or stockholders documents to close a sale to CI Financial, its subsidiaries, or its affiliates;

"3.     Transferring all or substantially all the assets of Meritage Portfolio Management, Inc. to any other entity; and

"4.     Otherwise altering the ownership structure of Meritage Portfolio Management, Inc."

The defendants initially appealed the decision but dropped the appeal. Bergman then moved for summary judgment on January 23, 2023. The defendants filed a combined memorandum in opposition to Bergman's motion for summary judgment and in support of their cross-motion for summary judgment on April 18, 2023. On June 1, 2023, the district court heard oral arguments from counsel on their motions.

At this hearing, Bergman added an argument which had not been raised in earlier pleadings or proceedings. He asserted that the Amended Agreement, specifically the ROFR, is ambiguous when read with Section 6, titled Solicitation Reduction Payment. Bergman argued that Section 6 shows "ambiguity as to the scope of the Bergman right of first refusal."

Section 6 states:

"In the event that any client terminates, either partially or completely, its relationship with the Company or EBK Trust Company within two years of the

9

termination of the employment of a Stockholder (other than Bergman) with the Company and that Stockholder, or any company or other entity which such Stockholder controls or with which such Stockholder is associated, establishes an investment advisory or trust company relationship with such client, then the price for such Stockholder's Stock shall be reduced by a Solicitation Reduction Amount (as defined below). In the event that the Solicitation Reduction Amount exceeds any remaining amounts owed to such Stockholder by the Company or any other Stockholder with respect to the price for such Stockholder's Stock, then such Stockholder shall pay such excess amounts to the Company or other Stockholders upon demand. The Company and the other Stockholders shall have the right to offset any Solicitation Reduction Amount (as defined below) against amounts owed by them to such Stockholder. For purposes of this Agreement, the term 'Solicitation Reduction Amount' shall mean an amount equal to 200% of the Annual Value of such client, where the 'Annual Value' is equal to (a) the actual gross revenue of the Company from such client for the past 12 months, in the event such client has been a client of the Company for more than 15 months at the time of such Terminated Stockholder's termination, or (b) the projected gross revenue of the Company from such client for the 12 months succeeding such termination, in the event such client has been a client of the Company for 15 months or less at the time of such Terminated Stockholder's termination."

At that same hearing, Bergman added another new theory of breach of contract. He argued that the proposed deal with CI Financial would result in the defendants violating Section 6:

"If you look at the deal documents, the list of transferred employees from Meritage to the new LLC:  Eveans, Klein, Mitchell, and there's more, but they are going to work for this new LLC . . . .

. . . .

". . . [I]t is clear in the deal documents of CI that they are supposed to do exactly what Section 6 prevents, what it contemplates and doesn't allow. So that's our theory of breach of the contract."

10

In a written order dated October 10, 2023, the district court denied Bergman's motion for summary judgment and granted the defendants' cross-motion for summary judgment. The district court concluded as a matter of law Bergman's failure to demonstrate that the Amended Agreement was ambiguous prevented him from looking to extrinsic evidence to prove breach of contract. The district court stated: "Plaintiff concedes that no Defendant offered to sell stock in Meritage Portfolio Management, Inc. in connection with the CI Financial deal . . . . Given the unambiguous limitations in the ROFR . . . , this uncontroverted fact requires the Court to grant summary judgment in favor of Defendants."

The district court also rejected Bergman's new ambiguity argument that the meaning of the "Stock" is ambiguous based on the way Section 6 uses the term. The court found this to be an attempt to remedy his summary judgment brief's omission of "any attempt to demonstrate ambiguity in the relevant terms." The district court did not rule on Bergman's theory of breach of contract that the proposed transaction with CI Financial would require the defendants to violate Section 6. Bergman did not file a motion for additional findings of fact and conclusions of law.

Two days after the district court issued its order, Bergman filed a notice of appeal.

ANALYSIS

*The District Court Did Not Err in Granting Summary Judgment to the Defendants*

*Standard of Review*

"An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or rulings. Whether a written instrument is ambiguous is a question of law subject to de

11

novo review." *Great Plains Roofing and Sheet Metal, Inc. v. K Building Specialties, Inc.*, 62 Kan. App. 2d 204, 209, 510 P.3d 1172 (2022).

*Discussion*

Summary judgment can be granted if there are no genuine issues of material fact and "'the moving party is entitled to judgment as a matter of law.'" *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 298 Kan. 503, 512, 314 P.3d 852 (2013). The same rules are applied on appeal; if the court finds that "'reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.'" 298 Kan. at 512.

We review a few preliminaries regarding when a written instrument is ambiguous. "Contract language is ambiguous only when the words used to express the parties' meaning and intention may be understood to reach two or more possible meanings." *Trear v. Chamberlain*, 308 Kan. 932, Syl. ¶ 3, 425 P.3d 297 (2018). When the "'"natural and reasonable interpretation"'" of a written instrument is applied and there is more than one possible outcome or meaning, that document is ambiguous. *Geer v. Eby*, 309 Kan. 182, 192, 432 P.3d 1001 (2019). A contract that is plain and unambiguous on its face must be enforced according to its own terms. *Boos v. Nat'l Federation of State High School Assoc.*, 20 Kan. App. 2d 517, 524, 889 P.2d 797 (1995). An appellate court may not "rewrite" a contract "under the guise of construction." 20 Kan. App. 2d at 525-26.

*The Amended Agreement is not ambiguous.*

Bergman argues the Amended Agreement, and specifically the ROFR, is ambiguous. According to Bergman, if Sections 5 and 6 are read together, it would "call into question whether defendants can terminate their Meritage employment and move clients to a different company without triggering the Bergman ROFR." Bergman claims

12

this presents a question of fact for the fact-finder because "Section 6 at least renders ambiguous the scope of the Bergman ROFR in Section 5."

Bergman cites to *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013), for the proposition that ascertaining the parties' intent is the primary rule for contract interpretation and that the intent is determined from the language of the contract if those terms are clear. While that is true, Bergman fails to explain how *Waste Connections* helps his case. The issue in *Waste Connections* centered on a dispute over the price at which Waste Connections could buy a transfer station under a ROFR because the Escrow Agreement that created the ROFR was silent on the issue of price. The *Waste Connections* court turned to extrinsic evidence because the written documents did not settle the crucial element in dispute. 296 Kan. at 972.

Here, the Amended Agreement explicitly defined those terms. Furthermore, *Waste Connections* did not involve stock or stockholders' rights. *Waste Connections* does not help Bergman in persuading us to read Section 5 together with Section 6 to somehow expand the contract's definition of "Stock" and "Stockholder."

Without question, Sections 5 and 6 should be read together, as they are both provisions in a contract. Yet, as the defendants point out, both sections use the terms "Stock" and "Stockholder" in the same manner. Bergman argues that the defendants advance "the most narrow possible interpretation of the term 'Stock.'" But "Stock" is defined in the Amended Agreement. Interpreting "Stock" as written and defined in the Amended Agreement is not a narrow interpretation—it is the interpretation agreed upon by the parties when they executed the contract.

Bergman fails to advance a different definition of "Stock" but continues to assert that extrinsic evidence should be admitted. Bergman does not cite any analogous cases to support his argument. He merely asserts that reading Section 6 together with Section 5

renders Section 5 ambiguous. Although Section 5 plainly applies to sales of Stock by Stockholders, Bergman attempts to broaden the definition of stock to include assets. But here, no stock has been bought, sold, or otherwise changed hands—a fact Bergman conceded. The Amended Agreement is silent as to asset sales by the corporation's board of directors. And Bergman makes no argument that asset sales should be treated the same as stock sales under the law.

Section 6, the district court explained, "seeks to discourage situations where one of the employee-Stockholder departs for a competing firm and takes Meritage's clients with them[.]" Because the provision assesses a deduction on the purchase price "that a departing Stockholder can receive for his or her Stock[,] [i]t has nothing to do with the ROFR at issue in this case[.]" As the district court explained:

> "Far from establishing that the term 'Stock' is ambiguous, Section 6 uses the term in the same manner as the ROFR and the Agreement as a whole. 'Stock' in Section 6 still refers to the common stock of Meritage Portfolio Management, Inc. And 'Stockholders' still refers to those who own shares of Stock (*i.e.*, the Parties here). Plaintiff's last-hour argument fails to establish an ambiguity with respect to a term that is clearly and expressly defined at the outset of the Agreement and used consistently throughout."

We agree. In this case, the Amended Agreement's terms used to express the parties' meaning and intention, including the specific terms of "Stock" and "Stockholder," do not reach two or more possible meanings, and thus, are not ambiguous. See *Trear*, 308 Kan. 932, Syl. ¶ 3. Contrary to Bergman's argument, reading both sections together does not render Section 5's language ambiguous.

Bergman also turns to extrinsic evidence in support of his argument. For instance, Bergman argues that we should infer that the defendants' editing of the title of the CI Financial purchase agreement from Membership Interest Purchase Agreement to

14

Purchase Agreement, and then to Asset Purchase Agreement, was made to "camouflage the substance of the transaction."

Bergman asks us to consider extrinsic evidence, such as the ulterior motives of the parties, rather than construing the Amended Agreement by its own written terms. Instead, we follow the rule that "[t]he facts and circumstances surrounding the document's execution become relevant only if the instrument is ambiguous on its face and requires aid to clarify it." *City of Manhattan v. Galbraith*, 24 Kan. App. 2d 327, 332, 945 P.2d 10 (1997). Here, because the Amended Agreement is unambiguous, we cannot consider extrinsic evidence. See *Waste Connections*, 296 Kan. at 963.

*Bergman's additional argument that the proposed deal required defendants to violate Section 6 is not preserved for review.*

Bergman also argues that this deal "plainly required defendants to violate Section 6." At the June 1, 2023 hearing, Bergman argued:

> "If you look at the deal documents, the list of transferred employees from Meritage to the new LLC: Eveans, Klein, Mitchell, and there's more, but they are going to work for this new LLC . . . .
>
> . . . .
>
> ". . . [I]t is clear in the deal documents of CI that they are supposed to do exactly what Section 6 prevents, what it contemplates and doesn't allow. So that's our theory of breach of the contract."

When the district court issued its ruling, the court did not consider Bergman's breach of contract theory—that the CI Financial deal caused the defendants to violate Section 6.

In order to preserve an issue for appeal, Bergman has a duty to object to inadequate findings of fact and conclusions of law by filing a postjudgment motion before the district court. See *In re Marriage of Karanja-Meek and Meek*, 320 Kan. 313, 315, 567 P.3d 252 (2025). Here, Bergman failed to preserve this issue by objecting to inadequate findings of fact and conclusions of law, which in turn gives "the trial court an opportunity to correct them." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 378, 855 P.2d 929 (1993). Without an adequate record as to this specific argument, we are unable to review this issue.

### *The ROFR was not triggered.*

The district court concluded that the ROFR is triggered "only if common stock in Meritage Portfolio Management, Inc. is offered for sale by a Stockholder." Bergman asserts Eveans and Klein, who own over 80 percent of Meritage shares, testified they would vote in favor of the deal with CI Financial. He argues that their intent was to sell their equity in Meritage because "[t]he only exchange of value would be money for equity ownership in the new LLC." Bergman fundamentally misstates the difference between a stockholder's actions and a corporation's actions as taken through its board of directors. Eveans and Klein did not offer their shares for sale as stockholders. They were prepared to vote on the *corporation's* sale of assets. The defendants acknowledge this distinction. Bergman illustrates in his reply brief that he is conflating the stockholders' actions with the board's actions. He states that "the lines blur" when the majority shareholders control the board. He cites no legal authority. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) ("Issues not adequately briefed are deemed waived or abandoned.").

"An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S.

16

Ct. 1655, 155 L. Ed. 2d 643 (2003). In simple terms, "the capital or assets of the corporation are its property," while "the shares evidenced by the stock certificates are the property of the shareholders." 1 W. Fletcher, Cyclopedia of the Law of Corporations § 31 (2025).

K.S.A. 17-6801(a) allows every corporation to sell "all or substantially all of its property and assets" as the "board of directors or governing body deems expedient and for the best interests of the corporation." Even though K.S.A. 17-6801(a) requires a resolution adopted by the majority shareholders, a vote in favor of the asset sale here did not result in the stockholders selling their shares. A favorable vote, rather, authorized the *corporation* to act. The Amended Agreement, by its explicit terms, does not restrict that *corporation* action.

"Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." *Kansas Heart Hospital, L.L.C. v. Idbeis*, 286 Kan. 183, 197, 184 P.3d 866 (2008). Similar to the Kansas General Corporation Code, "there is no statutory limitation on the right of a Delaware corporation to sell its assets on such terms and conditions and for such consideration as its board of directors deems expedient and for the best interests of the corporation." *Alcott v. Hyman*, 40 Del. Ch. 449, 456, 184 A.2d 90 (1962). In *Alcott*, Associated's minority shareholders claimed that the result of a complex transaction wherein "the purchase by United of the stock of Associated followed by the use of such stock as consideration for the purchase of substantially all of such latter corporation's assets" left them "merely [holding] equity in the shell of a once going business, the assets of which" had effectively been sold. 40 Del. Ch. at 453, 454. The *Alcott* court held that the transaction was permitted by the laws of Delaware. 40 Del. Ch. at 461.

Here, Bergman is claiming that the CI Financial deal, which will leave him with shares of a shell corporation, is somehow a violation of his ROFR. But there is nothing in the Amended Agreement that would prohibit the CI Financial deal.

The Supreme Court of Pennsylvania has considered a similar contract interpretation case where it held that "a cash-for-stock merger did not trigger the right of first refusal in a closely-held corporation's buy-sell agreement" because "a merger is a corporate act, not a shareholder act, and therefore does not fall within the Buy-Sell Agreement's restrictive transfer provisions." *Seven Springs Farms, Inc. v. Croker*, 569 Pa. 202, 204, 209, 801 A.2d 1212 (2002). The merger agreement in contemplation by Seven Springs provided that "existing shares of Seven Springs would be 'converted' into the right to receive cash and certain deferred cash payments, and the shares of the Booth Creek subsidiary would be 'converted' into shares of Seven Springs." 569 Pa. at 207. The parties disputed the meaning of the phrase "'no Stockholder . . . shall transfer, assign, sell, pledge, hypothecate, mortgage, alienate or in any other way encumber or dispose of all or any part of his stock in the Corporation.'" 569 Pa. at 208. The *Seven Springs Farms* court concluded that merger was a corporate act and was not governed by the restrictions on shareholders' disposition of stock. 569 Pa. at 209. This is the situation here as well. The sale of Meritage's assets to CI Financial was a corporate act, not a shareholder act.

Finally, the parties here are not unsophisticated. See *National Bank of Andover v. Kansas Bankers Surety. Co.*, 290 Kan. 247, 261, 225 P.3d 707 (2010) (finding contract between "two sophisticated commercial entities" should be upheld as written); *O'Neill v. Herrington*, 49 Kan. App. 2d 896, 906-07, 317 P.3d 139 (2014) (finding "a sophisticated businessman" could not be excused from his contractual obligations simply because he was acting pro se).

This case involves parties who are owners of a multimillion-dollar corporation with legal counsel who assisted them before entering into the Amended Agreement. Had

18

they intended to prevent the corporation from selling its assets or restructuring by transferring assets to a subsidiary and then selling the subsidiary, they would have included such a prohibition on corporate actions. But as it is written, the Amended Agreement defines "'Stockholders'" to include only those individuals who executed the Amended Agreement, and "'Stock'" to include only the common stock of the company. No additional definitions of "stockholders" or "stock" are presented in the Amended Agreement. There is therefore no indication that corporate actions such as asset sales were meant to be prohibited.

Bergman states in his reply brief that the sole purpose of structuring the CI Financial deal as an asset sale "was to sidestep the Bergman ROFR." Even so, Bergman has failed to show how these actions breached the Amended Agreement. The district court correctly granted summary judgment to the defendants.

Affirmed.